[Crim. No. 6897. In Bank. Dec. 14, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT GREEN HUGHES, Defendant and Appellant.

Gregory S. Stout, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendant appeals (by operation of Pen. Code, § 1239, subd. (b)) from judgments of death and of imprisonment imposed pursuant to jury verdicts finding him guilty of murder in the first degree, assault with a deadly weapon, and five counts of armed robbery. The jury fixed the penalty for the murder conviction at death, and the trial court denied defendant's motions for a new trial and for reduction of the penalty to life imprisonment.

Defendant contends that his counsel's right to question the prospective jurors on *voir dire* concerning their views on imposing the death penalty was unduly restricted; that defendant was denied his constitutional right to be represented by counsel when the trial court refused to appoint a private attorney in place of the Public Defender of Los Angeles County; and that the deputy public defender's conduct of the defense was such that he was denied the right to competent and effective aid of counsel. We have concluded that defendant's contentions are without merit, that the record discloses no prejudicial error or unfairness to defendant at any stage of the proceedings, and hence that the judgments of conviction should be affirmed.

Defendant was charged by information with commission of the following crimes: Armed robbery of Clifton Moye on October 18, 1960 (Count I); armed robbery of Burl Jackson on October 21, 1960 (Count II); assault with a deadly weapon on Burl Jackson during the second armed robbery (Count III); armed robberies of Winston Thibodeaux, Ray Stivers, Weddie McCarty, and Roy Brooks on November 15, 1960 (Counts V, VI, and VII), and the murder of Winston Thido-

deaux during the latter robberies (Count IV). The public defender was appointed as counsel for defendant and a plea of not guilty was entered to each count.

The crimes took place at or in the vicinity of three gasoline service stations in the Los Angeles area. At the trial the various robbery victims, all service station attendants or their friends, testified to substantially the same sequence of events: Defendant had approached each service station at night and had made an inquiry implying either that he wished to purchase a tire or to have one repaired; he then displayed one or two guns and announced a holdup, saying, "This is for real" or "This is the real thing"; after taking money or other valuables from his victims he marched them at gun point some 200 to 250 yards from the service station and ordered them to run.

The principal victim of the October 21 robbery, Burl Jackson, was also the victim of the assault with a deadly weapon on that date. He testified that during the robbery, and without any threat or provocation on his part, defendant shot him in the leg at close range; and that after he fell to the ground defendant bent down and put the gun next to his ear, saying, "If you say a word or open your mouth the next one will be through your head." The witness further testified that when two other service station attendants entered soon afterwards defendant held them at gun point and warned, "I shot one, I will kill the next one."

The murder victim, Winston Thibodeaux, was the sole attendant on duty at the Pathfinder Service Station at 1 a. m. on November 15, 1960. Two friends of his, McCarty and Brooks, were visiting him at that time when defendant appeared and robbed all three at gun point. McCarty and Brooks testified that defendant then marched his three victims some 200 to 250 yards away from the service station. When they stopped defendant pulled a pair of gloves from Brooks' pocket (Brooks worked as an attendant at another service station) and said to Thibodeaux, "I thought you told me that this guy didn't work at the station." Thibodeaux answered, "No, they don't work at the station." Defendant then said, "You just telling me a God damn lie," and shot Thibodeaux in the chest. The latter fell, crying for help. The other two men pleaded with defendant not to shoot them and he ordered them to turn and run. Thibodeaux was found dead shortly afterwards by the service station owner.

The autopsy surgeon testified that Thibodeaux's death was

caused by a gunshot wound of the chest, which penetrated "the heart, the stomach, the spleen and the left lung with massive hemorrhage." A ballistics expert testified that the bullet which the autopsy surgeon extracted from the body had been fired by a .25 caliber automatic pistol. The victim of the first robbery testified that defendant took a pistol of that type from his service station, and the victims of the subsequent robberies testified that defendant carried and used such a weapon.

Defendant left the Los Angeles area on November 17, 1960, and went to Milwaukee, Wisconsin. While there, he sent a letter to a friend in Los Angeles asking for money. The mother of his correspondent went to the police. Defendant was arrested in Milwaukee on December 29, 1960, and was turned over to California authorities. One of the police officers who brought defendant back to California testified that during the return flight defendant said that he would tell them "who the other man [involved in robberies with him] was and about all the robberies that he knew about if we could guarantee him that he would not go to the gas chamber." The officers answered that they could not make such a promise.

Defendant took the stand, denied committing any of the crimes charged, and produced his brother as an alibi witness. He admitted, however, that when he left for Milwaukee on November 17 he knew that a murder had been committed two nights previously during a service station robbery; that while he was in Milwaukee he was told by friends in Los Angeles that a composite sketch of the robber published in the newspapers resembled him; and that on the return trip in custody to Los Angeles he told the police officers "about the robberies that I did commit," but that they were not the ones with which he was charged; i.e., did not include one in which murder was committed.

The principal factual issue on the trial was that of identification of the robber-murderer. Three or four days after the events of November 15 the victims of each of the robberies were asked to describe their assailant's features to a police department artist, who prepared the above mentioned sketch for newspaper publication. Several of the victims thereafter selected defendant's photograph from among hundreds of "mug shots" shown to them. Upon defendant's return to Los Angeles he was identified in police lineups by a number of the victims. At the trial each victim pointed out defendant as the robber and, in the case of witnesses McCarty and Brooks,

as the murderer of Thibodeaux. The jury returned verdicts finding defendant guilty of each of the crimes charged.

Defendant does not question the sufficiency of the evidence to support the verdicts and judgments; nor does he complain of errors in the admission or exclusion of evidence or the giving or refusing of instructions. After an independent review of the record we are convinced that no such challenge could in any event be sustained. Defendant's counsel on appeal is commendably frank in recognizing that the errors at defendant's trial, if any, were errors of omission rather than commission and at most are susceptible of a number of differing inferences.

Defendant's first contention is that his trial counsel's right to examine the prospective jurors on *voir dire* with respect to their views on imposing the death penalty was unduly restricted. In particular, defendant asserts that in sustaining an objection by the People the trial court prevented his counsel's questioning the jurors to determine whether any might be "bloodthirsty" or "particularly for the death penalty." The relevant questions, objection, and ruling are set out in the footnote.[1]

It is clear, as the People acknowledge, that counsel for a defendant in a capital case has the right to question the

---

[1] "MR. NUNNELLEY [deputy public defender]: Now, I will assume unless you indicate otherwise, you do not mean by that that you are particularly for the death penalty, is that correct? MRS. COLBY [a juror]: That is right.

"MR. NUNNELLEY: In other words, you wouldn't say, 'I am for it,' but as long as it is the law, it becomes your duty as a juror to enforce it, and you will enforce it? MRS. COLBY: That is right.

"MR. NUNNELLEY: If you feel that you should? MRS. COLBY: Yes, sir.

"MR. NUNNELLEY: You understand in a trial like this, the People are entitled to jurors who won't just take the box and be against the death penalty if they think it might be a death penalty case; by the same token, the defendant is not to have bloodthirsty people, but people who will only impose it if the law permits, where they think it should be imposed. Do you understand that? MRS. COLBY: Yes, sir.

"MR. NUNNELLEY: Is that the way you feel now? MRS. COLBY: Yes.

"MR. NUNNELLEY: Is that a fair statement? MRS. COLBY: Yes, sir.

"MR. NUNNELLEY: Are there any of the rest of you who feel any differently more or less, than the way Mrs. Colby has expressed herself, or that I have for her?

"I will assume unless you say otherwise, there is no one here for the death penalty, affirmatively for it.

"MR. PACHTMAN [deputy district attorney]: I think that is a hard type of a question to put to people. That is asking to prejudge the facts, and I object to that type of a question.

"THE COURT: Read that carefully to me, please.

"(Whereupon the record was read as requested.)

"THE COURT: Well, I think that is calling for an expression. I will sustain the objection. Of course, I have no, obviously, objection to you

prospective jurors on *voir dire* for the purpose of ascertaining whether any would vote to impose the death penalty without regard to the evidence in the event of a conviction. ▮ While a challenge on that ground is not specifically provided for in section 1074 of the Penal Code (implied bias), section 1073 permits a challenge for actual bias ''For the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, . . .'' ▮ The entertaining of an immutably established opinion in favor of invariably selecting the death penalty in any case where the offense charged is punishable at the discretion of the jury either by death or imprisonment is such a ''state of mind . . . which will prevent [the juror] from acting with entire impartiality and without prejudice. . . .'' (*Cf. People* v. *Duncan* (1960) 53 Cal.2d 803, 812-816 [4] [3 Cal.Rptr. 351, 350 P.2d 103].)

▮ There can be no doubt that '' 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution.' '' (*People* v. *Elliot* (1960) 54 Cal.2d 498, 504 [9] [6 Cal.Rptr. 753, 354 P.2d 225], quoting from *Lombardi* v. *California St. Ry. Co.* (1899) 124 Cal. 311, 317 [57 P. 66].)

▮ In order to intelligently exercise the right to challenge for cause defendant's counsel must be accorded reasonable opportunity to lay a foundation for the challenge by questioning the prospective jurors on *voir dire* to learn whether any entertain a fixed opinion of this nature. (*Cf. People* v. *Duncan* (1960), *supra,* 53 Cal.2d 803, 812-816 [4] ; *People* v. *Wein* (1958) 50 Cal.2d 383, 394 [1] [326 P.2d 457], and cases there cited.)

▮ Here the court properly permitted defense counsel to address the quoted (fn. 1) specific questions to Mrs. Colby. Although the question which counsel then directed to the remainder of the panel might have been correctly understood by them, it was not entirely clear and might well have been misunderstood. In the circumstances the court did not err in

---

asking these jurors if they would be swayed from a fair deliberation of the case, despite how they might ultimately care as to subscribe to such a law, that is one thing, but the question is, would they be swayed by their own personal opinion, would that sway them in any way, where they could not be fair and impartial in passing on the facts, and in applying the law as it now stands.

''I will sustain the objection, the way the question is framed.''

ruling, "I will sustain the objection, the way the question is framed." By the use of that language the court made it clear that inquiry on the subject was not foreclosed. Not only was it not foreclosed, but the record shows that defendant's counsel took the opportunity to continue questioning the jurors individually to determine whether any were "particularly for" the death penalty and in the event of a conviction would vote to impose it without regard to the evidence. Some instances of that questioning and the jurors' responses thereto are excerpted in the footnote.[2] It is apparent from the whole record that defendant's counsel was not "unduly restricted" in the *voir dire* questioning of jurors.

[2] "Q. [MR. NUNNELLEY]: What about you, Mrs. Strangio? Do you have any particular feelings one way or the other about it? MRS. STRANGIO: Well, I am pretty much the same as the others; as far as the death penalty itself, that is our law, and we have to abide by it, but my own feeling that I have is, it would have to be real factual, not anything circumstantial, to give somebody the death penalty. . . .

"MR. NUNNELLEY: But you are not particularly for it or against it? . . .

"MR. NUNNELLEY: What about you, Mr. Williams? MR. WILLIAMS: I am not neither for nor against. I have an open mind.

"MR. NUNNELLEY: How about Mrs. Bruce? Do you have any particular feeling? MRS. BRUCE: I believe it is our law, and until another law is made, that is it, and if I will be as—I will weigh the evidence. That is the only thing I can do.

"MR. NUNNELLEY: And you will apply it as your conscience dictates it should be? MRS. BRUCE: Yes, sir. . . .

"MR. NUNNELLEY: You would have, let's say, you would be neutral except insofar as the facts required you to act, is that correct? MRS. BRUCE: Yes, sir, I would be neutral.

"MR. NUNNELLEY: And would it be a fair thing to state that you are neither for nor against the death penalty as such? MRS. BRUCE: No, I am not.

"MR. NUNNELLEY: You wouldn't go out and campaign for it? MRS. BRUCE: No.

"MR. NUNNELLEY: You wouldn't campaign against it? MRS. BRUCE: No.

"MR. NUNNELLEY: How about you, Mr. Gilman? MR. GILMAN: I am not particularly for or against.

"MR. NUNNELLEY: You wouldn't care particularly to extend it, but at the same time if it is the law, you are willing to enforce it, is that correct? MR. GILMAN: Yes, sir, I would say so. . . .

"MR. NUNNELLEY: How about you, Mrs. Bolding? MRS. BOLDING: I am not for it, nor against it. I am whatever way is the fairest. Let the chips fall where they may. . . .

"MR. NUNNELLEY: Let me put it this way: The mere fact that a case, say hypothetically, a case is one where a juror can go either for a death penalty or life imprisonment, he can do one or the other, the mere fact that the law provides you may go the death penalty, that of itself wouldn't induce you to go that far, it would have to be on your own consideration of all the facts, and all the cases on which you would rely to make your decision, is that right? MRS. BOLDING: That is right. . . .

"MR. NUNNELLEY: Mr. Childress, how do you feel in connection with this matter? MR. CHILDRESS: Well, I feel that I would decide on the

Defendant's second contention is that he was denied his "constitutional right to be represented by counsel of his own choice" when the trial court refused to appoint a private attorney in place of the public defender. At the arraignment defendant had been represented by a deputy public defender. At the start of trial, however, he apparently demanded that private counsel be appointed, whereupon the following took place:

"Mr. NUNNELLEY: If your Honor please, the defendant has indicated he wished to bring up a matter about his right to be represented by private attorney, and I think perhaps that is something that should be ——

"THE COURT: I can answer your argument or contention right now, if that is on his mind, and tell you right now, Mr. Hughes [defendant], that under the law of this State, if you are unable to afford your own private counsel, I have the right to appoint the Public Defender to represent you, and the Public Defender is paid by the taxpayers to represent defendants who are in custody, and who are unable to obtain their own private counsel, so that all defendants in felony cases are entitled to legal representation.

"I have no right to appoint a private lawyer to represent you, and to order him paid from the County Treasury. That right does not exist under these circumstances that exist here. I have had the Public Defender's Office represent defendants

---

evidence, and I would have to be certain he killed anybody before I would vote for a death penalty, and I would, of course, have to take the evidence. I wouldn't go against it. I would have to be fair, according to the trial. . . .

"Mr. NUNNELLEY: And you will be fair to the defendant as well as the People? Mr. CHILDRESS: That is right.

"Mr. NUNNELLEY: Is the mere fact that it is a possibility, that doesn't mean you have to go to the extreme penalty in a case, even though homicide has been admitted, his Honor instructs you that is the law and I submit it is, that you still will make your own decision on the matter of penalty? Mr. CHILDRESS: Well, that is right.

"Mr. NUNNELLEY: How do you feel, Mrs. Colby, about the matter? Mrs. COLBY: I feel it is the law and I will go strictly on the evidence.

"Mr. NUNNELLEY: Suppose you have a chance to use some judgment, you have two alternatives, what do you feel there should be something to help you make your decision on that, what would you rely on? Mrs. COLBY: I would rely on the evidence as I got it, and——

"Mr. NUNNELLEY: Well, would you consider the whole picture of the case, all, whatever counsel has to say, and all the evidence of the defendant, and what I have to say, for whatever it is worth, before you made up your mind on a problem as serious as that? Mrs. COLBY: Yes, sir.

"Mr. NUNNELLEY: How about you, Mr. Scholl? Mr. SCHOLL: Well, I am not for or against it at this time. . . ."

in this case for many, many weeks, for many years, as a matter of fact, over a period of since 1931. I have always found the Office to be efficient, capable, honest, and then, as to the law, they are grounded in the law.

''In the same respects, I can say that for the prosecution, too, but I am talking about the defense now. I have never had any suggestion from anybody that they are not fully capable and efficient. I have had sometime, people want to be in, say, they don't want the Public Defender, they want to get other counsel—I have had that happen, but I have always advised them, just as I am advising you, that if you are without funds to retain your own private lawyer, my limitations are in appointing the Public Defender to represent you here.''

The trial court's ruling was correct. ▉ Section 987 of the Penal Code provides that ''If [the defendant] desires and is unable to employ counsel, the court must assign counsel to defend him.'' While section 987a authorizes payment of compensation to private counsel appointed under section 987 from the general fund of the county, that authorization is declared to be operative only ''in a county or city and county, in which there is no public defender, or in a case in which the court finds that because of conflict of interest or other reasons the public defender has properly refused to represent the person accused, . . .'' In all other instances—including therefore the case at bench—it is the statutory duty of the public defender ''upon order of the court'' to represent any defendant who is financially unable to employ his own counsel. (Gov. Code, § 27706, subd. (a).) ▉ Our constitutional guarantee that an accused ''shall have the right . . . to appear and defend, in person and with counsel'' (Cal. Const., art. I, § 13; Pen. Code, § 686), substantially similar to that accorded federal defendants by the Sixth Amendment to the United States Constitution (*People* v. *Mattson* (1959) 51 Cal.2d 777, 795 [21] [336 P.2d 937]), is satisfied by the appointment and appearance of the public defender in behalf of the accused (the latter also being present). ▉ ''There is nothing in the law which entitles an accused to have the court appoint any particular attorney to defend him, and the refusal of the court to name a particular counsel was not a denial of defendant's right to be represented by counsel for, as said in *People* v. *Manchetti* (1946) 29 Cal.2d 452, 458 [175 P.2d 533]: '. . . defendant had no absolute right to be represented by a particular attorney.' (See also *People* v. *Stroble* (1951) 36 Cal.2d 615, 629 [226 P.2d 330], *affd.* (1952) 343 U. S. 181

[72 S.Ct. 599, 96 L.Ed. 872]; *People* v. *Howard* (1957) 150 Cal.App.2d 428, 430 [310 P.2d 120].)'' (*People* v. *Williams* (1959) 174 Cal.App.2d 364, 377 [3] [345 P.2d 47].) The federal cases relied on by defendant[3] deal with the denial of an accused's right to represent himself in propria persona and are not germane to the issue here under discussion.

Defendant's final contention is that he was denied his ''constitutional right to effective counsel.'' He asserts or implies that the deputy public defender did not use pretrial discovery procedures, that he demeaned the alibi defense in front of the jury, called unprepared witnesses, failed to object to certain leading, irrelevant, or argumentative questions, and in cross-examination was either insufficiently vigorous or by his questions opened up areas of inquiry previously closed to the prosecution. Defendant in effect asks us to infer that the deputy public defender was ''upset'' when his client requested private counsel and subconsciously might not have been able to ''suppress'' his feelings of ''anger and frustration,'' and thus might have been moved to ''consciously or unconsciously aid and abet the prosecution.''

A close reading of the transcript convinces us that such an inference would be unwarranted. ''This court can take judicial notice, . . . that it would be difficult to find in California any lawyers more experienced or better qualified in defending criminal cases than the Public Defender of Los Angeles County and his staff.'' (*People* v. *Adamson* (1949) 34 Cal.2d 320, 333 [16] [210 P.2d 13].) Mr. Nunnelley, the deputy who represented defendant at the trial, is conceded to be a veteran of 17 years' court experience. He conducted an active defense, cross-examining the People's witnesses at length on the crucial issue of identification and seeking to make the most of defendant's unconvincing alibi. While defendant's counsel on appeal may perhaps feel that he would have tried the case in a different manner, the asserted shortcomings (and they appear *only* by assertion) of Mr. Nunnelley's conduct of the defense, whether taken singly or together, fall far short of constituting ''such a lack of diligence and competence as to reduce the trial to a 'farce or a sham.' '' (*People* v. *Wein* (1958), *supra,* 50 Cal.2d 383, 410 [44], and cases there cited; see also *People* v. *Williams* (1958) 164 Cal.App.2d 285, 292-293 [11] [330 P.2d 942]; *People* v.

---

[3]*Adams* v. *United States* (1942) 317 U.S. 269, 279 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435]; *Reynolds* v. *United States* (1959) 267 F.2d 235, 236; *Duke* v. *United States* (1958) 255 F.2d 721, 724.

*Simeone* (1955) 132 Cal.App.2d 593, 597 [3] [282 P.2d 971].) In this connection it is noted that in ruling on defendant's motions for new trial and for reduction of the penalty the trial judge observed, "Well, it is my opinion that the defendant received a very fair trial here before the jury that tried this case and I think the People put on a straightforward case. I think the defendant through you [Mr. Nunnelley] was very ably and capably represented." Defendant's contention to the contrary cannot be sustained.

The judgments are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.