[Crim. No. 9205. In Bank. Feb. 4, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CLEVELAND LEE BROOKS, Defendant and Appellant.

Charles W. Thissell, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci, Paul N. Halvonik and John F. Kraetzer, Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—After a jury trial, defendant Cleveland Lee Brooks was found guilty of a violation of Penal Code section 220 (assault by means of force likely to produce great bodily injury with intent to commit rape). He has appealed from the ensuing judgment. The jury also found codefendant James Frederick Davis, who was represented by separate counsel, guilty of the lesser and included offense of violating Penal Code section 245 (assault by means of force likely to produce great bodily harm). Davis has not appealed.

Two issues are raised on appeal: (1) whether it was prejudicial error for the trial court to admit into evidence the statements made by defendant to the police following his arrest, and (2) whether defendant was denied due process of law as a result of certain statements made by his counsel in her final argument to the jury.

The testimony of the complaining witness may be summarized as follows: At about 4:30 a.m. on December 7, 1963, as she was leaving the apartment of a friend to return to her own apartment in the same building, she heard her name called by defendant, who lived in the apartment house and whom she had known for about two months. Defendant and Davis, whom she did not know, were sitting in Davis' automobile in the parking lot of the apartment project and were drinking whiskey. She was "slightly intoxicated." Upon the invitation of one of the men, she entered the car and drank some whiskey. Neither defendant nor Davis was intoxicated. She agreed to go for a ride to the beach with the two men. After they arrived at a parking area above the beach, she walked down to the beach and waded out into the water. Davis, who had followed her, urged her to come out of the water. She refused, and he, fully clothed, attempted to pull her back onto the beach. During the struggle she fell into the water and lost her wig. Once they were out of the water, Davis, now aided by defendant, brought her back to the car. Before they reached the car she heard defendant state that he intended to have sexual intercourse with her. When they reached the car defendant pushed her into the front seat from the passenger side. Davis aided by pulling her in from the driver's side and then came around to the passenger side of the car and held her legs. Defendant stated again that he was going to have sexual intercourse with her and was "egged on" by Davis. In an effort to stop her struggling, defendant hit her about the face and choked her. At the same time Davis twisted her leg. On her continued refusal, defendant began using the cigarette lighter from the dashboard of the car to

burn her, and burned her five or six times, once on each thigh and three or four times on the neck. She screamed while continuing to resist. Finally, when she indicated that she was about to become sick, Davis prevailed upon defendant to release her. While defendant pushed her out of the car he pulled her wedding band and engagement ring from her finger. Davis and defendant then drove off, leaving her by the roadside. Shortly thereafter, a uniformed park guard found her and took her to a nearby house to make a telephone call. She returned home in a cab, her husband called the police, and an officer took her to the San Francisco Emergency Hospital where she arrived at about 10:45 a.m.

Dr. Wiley Billingsley, who examined the complaining witness at the emergency hospital, testified that the most serious injuries sustained by her were the burns from the cigarette lighter, that all were second degree burns except one which was third degree, that the severity of the burns indicated that the lighter had been "applied straight on . . . with a fair amount of force," and that, in his opinion, the burns could not have been accidentally caused in a scuffle. Dr. Billingsley also testified that he found fresh contusions and abrasions on her face, mouth, lips, and forehead, that there was bleeding from the lips, and that at around 11 a.m. when he saw the witness he was of the opinion that her wounds were only from one to two hours old.

In an interview with Inspector John Mino of the sex crime detail of the San Francisco Police Department on the same day on which she sustained her injuries, the complaining witness identified defendant and Davis as her assailants. The police immediately commenced a search and issued a teletype for their arrest. As a result of this teletype defendant was arrested in Detroit by the Federal Bureau of Investigation and was placed in the custody of the Wayne County Jail in Detroit, Michigan.

On February 9, 1964, Inspector Mino and Inspector George Murray, also of the San Francisco Police Department, arrived at the Wayne County Sheriff's Office to bring defendant back to California. While the two police officers were at the sheriff's office they took statements from defendant which were recorded and which were subsequently admitted into evidence at trial and played before the jury.

In these statements defendant asserted that the complaining witness came to the car without being called by either him or Davis and asked to go for a ride, suggesting they go to the

beach, that after arriving at the beach she and Davis went down to the water, that, when he heard Davis shout for help, he went down to the water and helped Davis bring her back to the car, and that once in the car, all three got in the front seat. According to defendant's recorded statement, the complaining witness then became angry about the loss of her wig and attempted to burn him with the hot cigarette lighter and he and Davis wrestled with her to get the lighter; after recovering the lighter, Davis asked her to get out of the car, and he and Davis drove off leaving her there. Defendant denied taking her rings from her or burning her. Defendant's recorded statement included the damaging admission that when the police came looking for him at his mother's house in San Francisco he escaped through a rear window. He then indicated that he fled because he believed juries always believe complaining witnesses in rape cases and that he did not want to go to jail, and also because he knew that the complaining witness' boyfriend had a gun and might shoot him.

Defendant's testimony at trial differed in a number of respects from his statements to the police. At trial he stated that he did call the complaining witness over to the car, that, at the beach, after they returned to the car from the water, Davis got in the back, not the front seat, and that the complaining witness made sexual advances to him and asked him if he did not think her body was worth $10. When he replied that he did not think her body was worth $10 to him she began making gestures at him with the hot cigarette lighter. Defendant also testified that he took the hot cigarette lighter from her after wrestling with her. He denied ever attempting to have sexual relations with her or ever stating an intention to do so, denied beating her, denied that she was burned with a cigarette lighter in his presence, denied seeing burns on her body, denied hearing her scream, and denied seeing blood on her face when he and Davis left her at the beach. Defendant also contradicted the complaining witness' statements that she did not voluntarily kiss him before the group reached the beach and that he and Davis forced her out of the car and refused to drive her home. In addition, on the stand defendant denied that the reason he went to Detroit was that he knew that the police were looking for him and denied that there was any element of flight in his departure. He stated that the reason he went to Detroit was "to get . . . [his] sister for Christmas."

There is also some disparity between the trial testimony of the complaining witness and the information which she gave

to the police on the day the principal events occurred. In her statement to the police she said that it was defendant, not Davis, as she testified at the trial, who accompanied her into the water and who struggled with her there; and she denied that she drank any liquor with defendant and Davis. She also testified that rather than a park guard coming by to pick her up, two persons in an automobile found her and took her to a telephone. In most other respects the story she gave the police was consistent with her trial testimony. However, in her testimony on cross-examination, she admitted that she had been to the beach earlier on the morning of December 7th with another man. She did not mention this incident on direct examination; nor did she reveal it to the police. She told the police that she had been at the apartment of a friend from midnight until the time she met defendants.

The story told by codefendant Davis, both in his extrajudicial statement and in his testimony, differed in some respects from that of the prosecuting witness and of defendant. Since he has not appealed such testimony is not here relevant.

 The trial was completed before the decision of the United States Supreme Court in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. For that reason, defendant is not barred from raising the admissibility of his extrajudicial declarations by his failure to object at trial. Nor does the fact that such declarations were generally exculpatory in nature preclude him from raising their admissibility. (*People* v. *Hillery,* 62 Cal.2d 692, 711, 712 [44 Cal.Rptr. 30, 401 P.2d 382].)

 There can be no doubt that the investigation here was not a general inquiry into an unsolved crime, but had begun to focus on defendant. From the moment the complaining witness identified him and a warrant issued for his arrest, the process became accusatory. (*People* v. *Stewart,* 62 Cal.2d 571, 577-578 [43 Cal.Rptr. 201, 400 P.2d 97].) It is equally clear that the purpose of the interview in the Wayne County Sheriff's Office, and the purpose of recording that interview, could only have been to obtain information later to be used against the defendant at trial.

An examination of the total situation in which the interrogation took place reveals that the purpose of the questioning was to elicit incriminating statements in an accusatory setting. (*People* v. *Stewart, supra,* at p. 579.) Defendant had been positively identified by the complaining witness; the questioning took place in a sheriff's office where defendant had

been in custody following arrest; the questioning was conducted by two experienced police inspectors who had traveled a long distance for the purpose of conducting and recording the interrogation and of bringing defendant back to California; defendant was questioned alternatively by each officer and their questions sought to obtain an admission of complicity in the crime charged; finally, aside from defendant and the two San Francisco police officers, the only other person present during the interrogation was a Detective Mayberry of the Wayne County Sheriff's Office.

The record does not disclose that defendant was informed of his right to counsel or of his right to remain silent at any time prior to or during the questioning. Inspector Mino did not testify that defendant was so advised, nor does the transcript of the recorded interview so indicate. ■ In the face of a silent record an appellate court cannot presume that the police informed a defendant of his rights to remain silent and to counsel. (*People* v. *Stewart, supra,* 62 Cal.2d 571, 581; see *Carnley* v. *Cochran,* 369 U.S. 506 [82 S.Ct. 884, 8 L.Ed.2d 70].) We are compelled to assume, therefore, that defendant was not apprised of these rights. This case is, therefore, within the rule enunciated by us in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], unless it can be shown that defendant waived these rights.

■ The record is ambiguous as to whether defendant consulted with an attorney prior to the interrogation.[1] Although, taken alone, the italicized statement in the footnote above might indicate that defendant had spoken to an attorney prior to making the recorded statements to Inspector Mino, such an interpretation ignores the import of defendant's subsequent

---

[1] The Attorney General contends that defendant did consult with an attorney prior to the interrogation, relying solely on the italicized statement in the following colloquy which took place at trial between the prosecutor and defendant:

"[Deputy District Attorney]: Q. You remember talking to Mr. Mino in Detroit? A. Yes, I do.

"Q. You were picked up there on a warrant for fleeing this jurisdiction in connection with this crime, weren't you? A. Yes.

"Q. Now, and Mr. Mino, sitting next to me at the Counsel table, did he speak with you in Detroit, in the Detroit Sheriff's office in February? A. Yes, he did.

"Q. And did you not tell him that you had left your mother's house by the back way when the Police were in front because you didn't want to be arrested? A. *I didn't make no statement to Mr. Mino until I had talked to an attorney.* [Italics added.]

"[Deputy District Attorney]: That is not responsive, your Honor.

"THE COURT: Answer the question.

"THE WITNESS: No, I didn't talk to him at all.

"[Deputy District Attorney]: Q. You did not talk to Mr. Mino at

responses. These responses make it clear that defendant's statement that he did not talk to Mr. Mino at all probably means only that he did not confess or inculpate himself during the interview, or, the statement may have been purely the result of defendant's attempts to be evasive in his testimony. We do not regard the single statement cited by the Attorney General as an adequate foundation for the theory that appellant exercised his right to counsel and waived his right to remain silent at any time prior to or during the time at which the recorded statements were made.

But even if defendant had spoken to an attorney prior to making the recorded statements, it need not affect the admissibility of the statements. ▉ The burden is on the prosecution to show that a defendant was either informed of his rights to counsel and to remain silent or otherwise waived them. (*People* v. *Roberts,* 63 Cal.2d 84, 90 [45 Cal.Rptr. 155, 403 P.2d 411]; *People* v. *Stewart, supra,* 62 Cal.2d 571, 581; *People* v. *Lilliock,* 62 Cal.2d 618, 621 [43 Cal.Rptr. 699, 401 P.2d 4]; *People* v. *Hillery, supra,* 62 Cal.2d 692, 712; cf. *People* v. *Underwood,* 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 39 P.2d 937].) In *People* v. *Modesto,* 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], the defendant conferred with his attorney prior to his interrogation by the police. Nevertheless, we held in that case that because the police failed to conform to the requirements of the rule in *Escobedo* in conducting the interrogation, the conviction must be reversed. We stated that "It is immaterial that defendant was allowed to consult with his attorney several hours earlier and was advised that he could talk to the police if he wished. . . . Escobedo had also discussed with his attorney what he should do in case of interrogation, but in this case as in the *Escobedo* case, there is no evidence that defendant was advised as to what he should or could do in the face of the continuing interrogation that took place. (*Escobedo* v. *Illinois,* 378 U.S. 478, 485, fn. 5. . . .)" (*Id.* at p. 446.)

---

all? A. I told him that I didn't know what was going on, I didn't know nothing.

"Q. That's all you told him? A. That's all I told him.

"[Deputy District Attorney]: No further questions.

"THE COURT: Why didn't you tell him what had happened?

"THE WITNESS: You mean what had happened on that day? Well, I sat down—he sat down and asked me what had happened, and I told him that I didn't know nothing about it, her getting burned, and he started bringing up a conversation about the rings.

"THE COURT: Anything further of this witness?

"[Deputy District Attorney]: No, your Honor."

In the instant case, defendant was deprived of the guiding hand of counsel at a critical stage in the development of the case against him. ■ The record does not show, nor is there an allegation and evidence which show, that defendant was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver. (*Carnley* v. *Cochran, supra,* 369 U.S. 506, 516; *People* v. *Stewart, supra,* 62 Cal.2d 571, 581.)

■ The introduction into evidence of defendant's extrajudicial statement was clearly prejudicial. First, there was a sharp conflict between the evidence presented by the prosecution and by the defense. Aside from defendant's extrajudicial statement, the prosecution relied principally on the testimony of the complaining witness. Much of her testimony, however, was impeached. The prosecution also relied on the testimony of the doctor. But this testimony was also consistent with innocence since the defense conceded that the complaining witness had been burned with a cigarette lighter, but denied that defendant had done it, suggesting instead that her common-law husband was responsible. Moreover, the statement of the doctor that her wounds were only one or two hours old when he examined her at 11 a.m. tended to support the defense theory. In short, the prosecution's case against defendant was by no means overwhelming.

Secondly, even though defendant denied guilt in his statement to the police, the statement was inculpatory to the extent that he admitted fleeing the state because he knew the police were looking for him and that he might otherwise be jailed. ■ Evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission. (*People* v. *Davis,* 48 Cal.2d 241, 251 [309 P.2d 1]; *People* v. *Santo,* 43 Cal.2d 319, 327 [273 P.2d 249]; *People* v. *Hoyt,* 20 Cal.2d 306, 313 [125 P.2d 29]; *People* v. *Murguia,* 6 Cal.2d 190, 192 [57 P.2d 115].)

■ Thirdly, in his testimony at trial defendant contradicted his earlier statement to the police that he fled to Detroit to escape arrest. Thus his testimony that he went to Detroit to see his sister was impeached by the subsequent introduction of the recorded statement that he fled because he knew the police were looking for him. In her final argument, the prosecuting attorney heavily emphasized this discrepancy and alleged the likelihood that the extrajudicial statement was accurate and the exculpatory testimony at trial a fabrication. Defendant's less incriminating trial testimony was

thus rendered substantially less effective than it could have been if the recorded statements had been excluded. As we noted in *People* v. *Underwood, supra,* 61 Cal.2d 113, "A prior statement, although exculpating in form, may prove highly incriminating at the trial because, upon a showing of its falsity, it can constitute evidence of consciousness of guilt. (See 3 Wigmore, Evidence (3d ed. 1940) § 821, pp. 241-242.)" (*Id.* at p. 121.) (See also *People* v. *Roberts, supra,* 63 Cal.2d 84, 91-92.)

The error in admitting defendant's extrajudicial statement was prejudicial under *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], for it is "reasonably probable" that had the statement to the police been excluded, a result more favorable to defendant would have been reached. Obviously, therefore, the error was prejudicial under the rule of *Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171], which requires us to ask only "whether there is a reasonable *possibility* that the evidence complained of might have contributed to the conviction." (Italics added.) Since under either standard the error appears to have resulted in a miscarriage of justice (Cal. Const., art. VI, § 4½; *People* v. *Davis,* 62 Cal.2d 791, 796-797 [44 Cal.Rptr. 454, 402 P.2d 142]), there must be a reversal of the conviction and a new trial.

A reversal on this ground makes it unnecessary to discuss at length defendant's additional contention that he was denied due process because of the tactics employed by his counsel in her final argument to the jury. We have read the record, including the arguments to the jury. Certainly, the record does not disclose that defendant was denied the effective aid of counsel. ■ What it discloses is that counsel argued, probably somewhat awkwardly, that even if her client was not to be believed, and had lied on the stand, the complaining witness had also lied and was not to be believed. Counsel was urging, with some merit, that despite the inadequacies of the defense, the prosecution had not sustained its burden of proof. This did not reduce the trial to a "farce or a sham," the test used to determine whether counsel's representation was ineffective. (*People* v. *Wein,* 50 Cal.2d 383, 410 [326 P.2d 457]; *People* v. *Robillard,* 55 Cal.2d 88, 96-98 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], cert. den. 365 U.S. 886 [81 S.Ct. 1043, 6 L.Ed.2d 199]; *People* v. *Hughes,* 57 Cal.2d 89, 99 [17 Cal.Rptr. 617, 367 P.2d 33];

*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P. 2d 487]; see generally, cases collected in 74 A.L.R.2d 1390, 1399; and cases commented on (1947) Colum.L.Rev. 115, 117.)

■ In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel. (*United States* v. *Stoecker,* 216 F.2d 51, 52; *People* v. *Martin* (1920) 210 Mich. 139 [177 N.W. 193].)

The judgment as to defendant Brooks is reversed.

Traynor, C. J., Tobriner, J., and Peek, J., concurred.

MOSK, J.—I dissent.

There were discrepancies in the stories of the prosecutrix. There were discrepancies in the several stories of defendants. Out of this cacophony the jury arrived at a verdict, which is probably as close to ascertainment of the truth as can be expected in considering the conduct of the participants, all apparently of dubious character.

The majority finds error in admission of defendant's extrajudicial statement. I find it to have been an attempt at exculpation, not a confession. The majority finds it "reasonably probable" (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]) that a result more favorable to defendant would have been reached absent the statement, and reasonably possible that the evidence contributed to the conviction (*Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171].) I find it neither probable nor possible that the result would have been different if the statement had been excluded in view of all the evidence.

Like the adversary proceedings at the trial, the foregoing conflicts between conclusions of the majority and those I reach are essentially factual. There being no miscarriage of justice, no justification exists for this court to substitute its concept of the evidence for that of the trial jury. (Cal. Const., art. VI, § 4½.)

I would affirm the judgment.

McComb, J., and Burke, J., concurred.