Filed 6/9/21  P. v. J.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br> J.B.,<br><br>    Defendant and Appellant. | F081287<br><br>(Super. Ct. No. 15CEJ600281-6)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Mary Dolas, Judge.

Courtney M. Selan, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Jennifer Oleksa, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On April 16, 2019, the Fresno County District Attorney filed a juvenile wardship petition alleging that J.B., a minor, committed four counts of second degree robbery (Pen. Code, § 211 [counts 1–4]).[1] As to each count, the petition alleged that he personally used a deadly and dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)). On December 16, 2019, following a contested jurisdiction hearing, the juvenile court found not true the robbery allegation on count 1; found true the robbery allegations on counts 2 through 4; and found not true the deadly and dangerous weapon allegations. At a May 4, 2020 disposition hearing, the court ordered that J.B. would remain a ward of the court and under the supervision of the probation department until November 4, 2021. He was committed to the New Horizons program for 365 days.

J.B. makes two contentions on appeal. First, the juvenile court "erred in finding [he] was one of the robbers in question …." (Capitalization omitted.) Second, the court "erroneously and prejudicially granted the prosecution's request for five additional days in which to prepare for [the] adjudication." (Capitalization omitted.) We conclude: (1) substantial evidence supported the court's robbery findings on counts 2 through 4; and (2) the purported five-day delay in the adjudication did not result in a miscarriage of justice.

## STATEMENT OF FACTS

### I.     Robbery of Palm Bluffs Liquor (Count 2)

On January 26, 2019, at approximately 10:20 p.m., cashier Harman V. and a coworker were stocking items at Palm Bluffs Liquor when two masked males entered the store. Harman recalled that one of the culprits "was wearing jeans that were kind of like a red color." Both carried what appeared to be handguns with "silver top[s]" and black "bottom[s]." The culprits threatened to shoot the employees and demanded money.

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

Harman opened the register and handed over cash and lottery tickets. After the culprits left, Harman called 911.

The store's surveillance cameras recorded the robbery. The footage showed that one of the robbers wore a white mask; a "dark colored hoodie"; tan boots "with white soles all the way around"; and pants that were "a blueish [*sic*] color toward the top" and "maroon reddish" from "midthigh to below the knees" "with some tears in them in the thigh area and knee area." He also had what appeared to be a semiautomatic handgun with a "[s]ilver top slide area" and black "handle portion." Other footage showed that a woman had entered and "looked through all the store" about 10 minutes before the robbery.

On January 27, 2019, at approximately 12:30 p.m., some of the stolen lottery tickets were scanned at EZ Mart Liquor. At that time, the store's surveillance camera captured a female driver and a male passenger exiting a Honda Civic and entering the premises. A license plate search revealed that the vehicle was registered to Michelle Sanchez. Law enforcement procured Sanchez's California Department of Motor Vehicles (DMV) photograph and confirmed that she was the same woman seen in Palm Bluffs Liquor's and EZ Mart Liquor's video recordings. The male passenger was identified as G.G., a minor.

On January 31, 2019, after a warrant was obtained, a tracking device was planted on Sanchez's Honda.

## II. Robbery of Bullard Avenue 7-Eleven (Count 3)

On February 3, 2019, Christopher V. was working the graveyard shift at the 7-Eleven located on the corner of Bullard and Palm Avenues. At approximately 4:00 a.m., he was making coffee in the back of the store when he "heard some commotion." Christopher, who "thought maybe someone was just looking for the clerk," "yelled back" "to let them know" where he was. To his surprise, three "dark skinned" males in masks confronted him. One carried what appeared to be "a longer rifle" and the other two

carried what appeared to be handguns. They threatened to shoot Christopher "on several occasions" and forced him to open the register. The culprits took money, lottery tickets, and cigarettes. After they fled, Christopher called 911.

The store's surveillance cameras recorded the robbery. The footage showed that one of the robbers covered his face with a red cloth and wore a "blue Champion jacket," "blue latex gloves," "some sort of dark pants," and "tan boots with white soles." He also had what appeared to be "a black and silver semi-auto handgun," which was "very similar" to the one used during the Palm Bluffs Liquor robbery.

At the time of the robbery, data from the tracking device disclosed that Sanchez's Honda was parked on Celeste Avenue, "two streets south" of the 7-Eleven, for about "eight minutes and one second." Later, an officer recovered three unopened cigarette packs near this location.

III.    **Robbery of Shaw Avenue 7-Eleven (Count 4)**

On February 3, 2019, Shelby H. was working the graveyard shift at the 7-Eleven located on the corner of Shaw and Maroa Avenues. At approximately 4:20 a.m., she was in the back of the store when three "dark skinned" males in masks entered the establishment. Shelby recalled that one of them wielded "a silver handgun" that "almost looked painted," leading her to believe "it was fake." Another had "an AK style knock off." At least one of the culprits "had blue gloves on." As the trio were "moving [Shelby] up the aisle," "the handgun was put on the back of [her] head." Upon contact, "the barrel depressed" and Shelby heard "a plastic noise." The culprits took money, lottery tickets, and tobacco products. After they left, Shelby called 911.

The store's surveillance cameras recorded the robbery. The footage showed that the three males wore the same clothing as the perpetrators who had robbed the Bullard Avenue 7-Eleven.

At the time of the robbery, data from the tracking device disclosed that Sanchez's Honda was parked on Maroa Avenue "just south of" Shaw Avenue for "5 minutes and 36 seconds." A $5 bill was found in a puddle of water near this location.

Following the robbery, data from the tracking device disclosed that Sanchez's car went to a residence on Grant Avenue. Thereafter, it ended up at a residence on San Pablo Avenue. DMV registration records confirmed that Sanchez lived at the San Pablo Avenue residence.

## IV.  Police Surveillance

Detective Xiong of the Fresno Police Department conducted surveillance of the Grant Avenue residence starting around noontime on February 3, 2019. He initially observed a "dark grey" Ford F-150 parked in front of a Toyota Yaris. Xiong then saw two Black women leaving the residence, loading a laundry basket and "a couple backpacks" into the Toyota, and entering the car. A male got out of the Ford, conversed with the woman sitting in the driver's seat of the Toyota, and entered the residence. The Toyota then drove away. The male came out of the residence and returned to the Ford. Afterward, a second male got out of the truck. Xiong testified:

> "So I observed a subject walking out into the intersection and just the way he was acting was strange. And that obviously caught my attention. He walked into the center of the intersection, started looking around kind of north/south, in all directions. And then it almost appeared like he was looking towards me also."

Xiong photographed the second male, who was wearing "burgundy colored pants." He later identified this individual as J.B. based on a prior mugshot. Xiong also watched Palm Bluffs Liquor's footage and verified that one of the robbers had worn the same unique pants.

Law enforcement records indicated that J.B. lived at the Grant Avenue residence.

## V.     Arrests and Searches

Warrants were issued for the arrests of Sanchez and J.B. and for the searches of their respective dwellings.  On February 5, 2019, Sanchez was arrested at the San Pablo Avenue residence.  Inside her home, officers found her cell phone, a $20 bill, lottery tickets, a lottery claim form, tobacco products, airsoft pellets, CO2 cartridges, "packaging which appear to belong to airsoft style gun," and a loaded handgun magazine.  A photograph of J.B. and G.G. that was extracted from Sanchez's cell phone was "taken or modified" on January 26, 2019 at 7:48 p.m.  Inside her Honda, which had been parked in the carport, officers found a backpack, a blue Champion jacket, and additional lottery tickets, which were confirmed to have been the ones taken during the Bullard Avenue 7-Eleven robbery.

On February 5, 2019, officers outside the Grant Avenue residence announced their presence via loudspeaker and repeatedly instructed J.B. and any other occupants to come out.  Two women—including J.B.'s mother—appeared at the front door, but "they were not very cooperative" and "weren't exiting."  Meanwhile, Officer Sullivan of the Fresno Police Department's K9 unit, was in "a rear perimeter position" when he observed J.B. "com[ing] up to the fence line," "put]ting] his head up over the fence," "look[ing] down at [him] in the alleyway," and "[going] back to where [he] couldn't see him anymore."  Eventually, officers were able to go inside the residence, but they could not find J.B.  A neighbor subsequently reported that "she had found blood in her backyard and believed someone had gotten into her garage."  Sullivan, his canine, and other officers went to the neighbor's garage.  Before entering, Sullivan identified himself and announced that he "was going to use [his] dog to search."  He then heard J.B. stating that he "was inside the garage," "was stuck inside a dryer," "was giving up," and "needed help to get out."  J.B., who exhibited cuts on his hand, was apprehended.

After J.B. was taken into custody, officers searched the Grant Avenue residence. In the living room, there were "tan Jordan shoes"; lottery tickets "pretty much

everywhere"; an "AK style airsoft," and a replica semiautomatic handgun with a silver "metal" "slide portion" and "plastic material bottom." In the southwest bedroom, there were "tan Nikes"; "purple burgundy colored pants"; a "black plastic bag" containing "a bunch of shredded up tobacco products" and three "light blue rubber gloves"; tobacco products on the windowsill, all of which except one were unopened; "a lot of" lottery tickets; a loaded gun; and an identification card belonging to a male other than J.B. Xiong, who participated in the search, confirmed that the pants were the same ones J.B. was wearing at the time of the February 3, 2019 surveillance. In the southeast bedroom, there were female clothing, an identification card belonging to a woman, and a black airsoft gun. In a hallway, there was a backpack containing tobacco products, most of which were unopened. Xiong confirmed that this backpack was carried by one of the women at the time of the February 3, 2019 surveillance. Finally, in the master bedroom, there were tobacco products.

## DISCUSSION

### I. Substantial Evidence Supported the Juvenile Court's Robbery Findings on Counts 2 Through 4

#### a. *Standard of Review*

"The same standard of appellate review is applicable in considering the sufficiency of the evidence in a juvenile proceeding as in reviewing the sufficiency of the evidence to support a criminal conviction." (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605, fn. omitted.)

"In reviewing the sufficiency of the evidence, the appellate court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*In re Cheri T.* (1999) 70 Cal.App.4th 1400, 1404.) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that

evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) "[O]n appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fn. omitted.) "'"'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*In re George T.* (2004) 33 Cal.4th 620, 631.)

"[O]ur sole function as a reviewing court in determining the sufficiency of the evidence is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*In re Michael M.* (2001) 86 Cal.App.4th 718, 726, fn. omitted.) "'"'[A] verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it.'"'" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.)

b. *Analysis*

On appeal, J.B. does not dispute that Palm Bluffs Liquor was robbed on January 26, 2019 and the Bullard Avenue 7-Eleven and Shaw Avenue 7-Eleven were robbed on February 3, 2019. Instead, he contends that the juvenile court "erred in finding [he] was one of the robbers in question …." (Capitalization omitted.)

"The sufficiency of the evidence of identification is generally a question for the trier of the facts." (*People v. Wiest* (1962) 205 Cal.App.2d 43, 45.) "In order to sustain a conviction the identification of the defendant need not be positive." (*Ibid.*) "The identification of the perpetrator of an offense may be established entirely by [circumstantial] evidence." (*People v. Barnum* (1957) 147 Cal.App.2d 803, 805.)

i. Robbery of Palm Bluffs Liquor (Count 2)

The record—viewed in the light most favorable to the juvenile court's findings—shows that on January 26, 2019, Sanchez entered and "looked through" Palm Bluffs Liquor around 10:10 p.m. Ten minutes later, the store was robbed by two armed masked

8.

males. One of the culprits wore pants that were "a blueish [*sic*] color toward the top" and "maroon reddish" from "midthigh to below the knees" "with some tears in them in the thigh area and knee area." The next day, lottery tickets taken during the robbery were brought to EZ Mart Liquor by Sanchez and G.G. to be scanned. On February 3, 2019, during his surveillance of J.B.'s residence, Detective Xiong observed J.B. outdoors wearing the same unique pants as one of the Palm Bluffs Liquor robbers. (Cf. *People v. Sanford* (2017) 11 Cal.App.5th 84, 92 [no evidence showing the defendant wore distinctive clothing items identified by witnesses during jewelry store heist].) In a subsequent search of J.B.'s residence, officers found those pants in a bedroom. Furthermore, a photograph of J.B. and G.G. was extracted from Sanchez's cell phone. That image was "taken or modified" on January 26, 2019 at 7:48 p.m., about two and one-half hours before the robbery. Given these circumstances, a trier of fact could reasonably conclude that J.B. was one of the two Palm Bluffs Liquor robbers.

ii. Robberies of Bullard Avenue 7-Eleven (Count 3) and Shaw Avenue 7-Eleven (Count 4)

Identity may be inferred from the factual similarities of the charged offenses. (See, e.g., *People v. Vines* (2011) 51 Cal.4th 830, 857–858, overruled in part by *People v. Hardy* (2018) 5 Cal.5th 56, 104; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1224; *People v. Miller* (1990) 50 Cal.3d 954, 988–989; *People v. Haston* (1968) 69 Cal.2d 233, 247–250 (*Haston*).) "To be admissible as modus operandi evidence there must be common marks which, considered singly or in combination, support the strong inference that [the] defendant committed [the] crimes." (*People v. Bean* (1988) 46 Cal.3d 919, 937.) "The inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." (*People v. Miller*, *supra*, at p. 987.) At the same time, the features "must be distinctive rather than ordinary aspects of any such category of crime." (*People v. Bean*, *supra*, at p. 937.)

The record—viewed in the light most favorable to the juvenile court's findings—shows that on February 3, 2019, three males robbed the Bullard Avenue 7-Eleven at around 4:00 a.m. and then the Shaw Avenue 7-Eleven at around 4:20 a.m. There were numerous similarities between these robberies and the Palm Bluff Liquors robbery on January 26, 2019. Each incident took place in Fresno under the cover of darkness and involved at least two armed masked perpetrators, the subjugation of workers on duty, and the theft of money and lottery tickets. We do not believe these common marks alone are "of that distinctive nature necessary to raise a logical inference" that J.B. was one of the 7-Eleven robbers because "[i]t is common knowledge that each … of the[se] indicated marks are shared … by very many armed robberies." (*Haston*, *supra*, 69 Cal.2d at p. 248.) However, the consideration of these marks in combination with other more conspicuous features supports that inference. First, in all three robberies, there was the presence of a semiautomatic handgun replica with a "silver top." In the search of J.B.'s residence, officers found that item in the living room. (Cf. *People v. Vines*, *supra*, 51 Cal.4th at pp. 847, 857–858 [ammunition as circumstantial evidence of identity].) Second, and perhaps more significantly, Sanchez—J.B.'s associate—participated in all three robberies. As noted, she cased Palm Bluffs Liquor 10 minutes before it was robbed by J.B. and another accomplice on January 26, 2019 and then brought the stolen lottery tickets to be scanned at a different liquor store on January 27, 2019. On February 3, 2019, data from the tracking device established that Sanchez's Honda was parked near the Bullard Avenue 7-Eleven and the Shaw Avenue 7-Eleven at the times of their respective robberies. Stolen items inadvertently discarded were recovered close to these parking spots. Following the robberies, the Honda stopped at J.B.'s residence before returning to Sanchez's residence. On February 5, 2019, after Sanchez was arrested, officers searched her vehicle and found a blue Champion jacket that resembled the one worn by one of the 7-Eleven robbers as well as lottery tickets that had been stolen from the Bullard Avenue 7-Eleven. "It is clear that [Sanchez's] presence … is a mark whose

10.

distinctive nature tends to differentiate [the charged robberies] from other armed robberies. There is only one [Sanchez], and h[er] conjunction with [J.B.] in [the Palm Bluffs Liquor robbery], together with h[er] [unequivocal] participation in the [two 7-Eleven] robberies …, supports the inference that [J.B.] … was h[er] accomplice in those [7-Eleven robberies]." (*Haston*, *supra*, at p. 249.)

We also point out that the three 7-Eleven perpetrators took lottery tickets and tobacco products; at least one of the perpetrators wore blue gloves; and officers found countless lottery tickets, tobacco products, and blue gloves in J.B.'s residence.

### iii. Flight

Lastly, the record—viewed in the light most favorable to the juvenile court's findings—shows that on February 5, 2019, when law enforcement instructed J.B. to exit his residence, he fled, snuck into a neighbor's garage, and tried to hide inside a dryer. "Evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission." (*People v. Brooks* (1966) 64 Cal.2d 130, 138; see *People v. Bigham* (1975) 49 Cal.App.3d 73, 78 [the defendant's flight when confronted by uniformed police and spontaneous exclamatory statement "'Jesus Christ, the cops'" indicative of consciousness of criminal involvement].)

### iv. Conclusion

In view of the foregoing circumstances, we conclude that substantial evidence supported the juvenile court's robbery findings on counts 2 through 4.

## II. The Purported Five-day Delay in the Juvenile Adjudication Did Not Result in a Miscarriage of Justice

### a. *Background*

On March 6, 2019, the juvenile court denied the prosecutor's motion to transfer J.B. from juvenile court to a court of criminal jurisdiction.

On March 18, 2019, J.B. waived time for the jurisdiction hearing for "+10" court days from April 3, 2019. On April 3, 2019, J.B.'s counsel was appointed and the matter

was continued to April 5, 2019. On April 5, 2019, J.B.'s counsel's request for a continuance "to reset adjudication" was granted. Adjudication was set to commence on April 15, 2019. On April 8, 2019, the date for the jurisdiction hearing was vacated and the proceedings were stayed pending an order from the Fifth District Court of Appeal on the prosecutor's writ petition regarding the juvenile court's denial of the transfer motion. The petition was denied. The stay was lifted on November 25, 2019.

A hearing on remittitur was held on December 3, 2019. The juvenile court reinstated criminal proceedings against J.B. J.B.'s counsel remarked:

> "[O]n March 18 of 2019 … [J.B.] waived time for his jurisdictional hearing to April 3rd of 2019 plus 10. I was appointed on [J.B.]'s case on April the 4th, made my first appearance in court on April the 5th. No additional time waivers were granted. The stay was granted on April 8th of 2019 so we were three court days into the 10-day period at the time when the stay was issued on April 8th. The stay was then lifted on November 25th. So five court days had elapsed, including today, from that date which means in my calculations, we should be on day eight of the 10-day period and that the case would time out on December the 5th. And so I would be asking to set it on December the 5th and we should proceed expeditiously."

The prosecutor responded:

> "It's the People's position when the stay was originally put into place by the Fifth District Court of Appeal, the court here lost jurisdiction regarding the timeout period for the adjudication. When the matter got placed on calendar for today, it's the People's position that … when we show up today, it's to set a new adjudication date with a new timeout being an additional plus 15 court days. [¶] … [¶]
>
> "The issue with setting it on [December] 5th is that the People need at least five business days to get subpoenas issued to witnesses and law enforcement personnel. So it's a difficulty running into that as well as arranging witnesses to come testify at the adjudication so it's putting the People in a very tough position as well. So we would be asking that at the very minimum … we set an adjudication date with the idea of being plus 10 court days from the timeout date from today."

12.

The juvenile court commented:

> "All right.  Well, I think we have two options.  One, my experience has been that once the stay is lifted, it goes back to the original time period which would be jurisdiction must be set within 15 court days if they are in custody.  The Court can set it within 10 days or even 7 days if that would accommodate the parties[,] but I don't have any authority one way or the other.  It's just been my understanding and practice … that once the stay is lifted, the original time periods resume[,] not what was in effect at the time the stay was ordered[,] because I do believe the People have a right to have at least some time to subpoena witnesses .…"

Following additional arguments by counsel, the court pronounced:

> "I do believe because there's been no authority given as to each of your positions and the time that's available, I think the most reasoned decision … is to go with the seven day statutory time allow[ed] to continue the matter once you pass the original jurisdiction date unless there's a specific time waiver which, in this case, there hasn't been.  So I think that would put us to the 12th as the timeout.  The most appropriate thing to do would be to set it for the 10th, again, this being no surprise that the opinion would be coming out on [November] 25th and [counsel] on behalf of [J.B.] would be requesting an adjudication date as soon as possible and the representation that the People need at least five days.  I think they can proceed today with making sure subpoenas get out which would give them at least the five court days to insure [*sic*] subpoenas are properly issued."

The jurisdiction hearing commenced on December 10, 2019.

b.     *Analysis*

Courts recognize a minor's right to a speedy adjudication in juvenile delinquency proceedings.  (*In re Chuong D.* (2006) 135 Cal.App.4th 1303, 1309 (*Chuong*).)  "Moreover, the statutory provisions establishing the juvenile delinquency process include very specific deadlines for processing a wardship petition."  (*Ibid.*)  For instance, "[i]n the case of a minor detained in custody at the time of the filing of the petition, the petition must be set for hearing within 15 judicial days from the date of the order of the court directing such detention."  (Welf. & Inst. Code, § 657, subd. (a)(1).)

13.

J.B. argues that the juvenile court "erroneously and prejudicially granted the prosecution's request for five additional days in which to prepare for [the] adjudication." (Capitalization omitted.)  He reiterates his counsel's contention below that the timeout date was December 5, 2019.  The Attorney General disagrees, reciting the prosecutor's contention below that "the statutory time to bring a matter to adjudication reset[s] after a previously imposed stay [i]s lifted."  Both sides appear to concede that there is no legal authority addressing the effect of a stay on the requirement to set a juvenile hearing within a statutorily prescribed period.  We need not resolve this issue.

Even assuming, arguendo, that the juvenile court erroneously delayed the adjudication by five days, "the speedy trial violation, in and of itself, does not entitle [J.B.] to a reversal of the court's order." (*Chuong*, *supra*, 135 Cal.App.4th at p. 1311.) "[O]n appeal after a judgment of conviction, a defendant must show more than an erroneous ruling of the trial court.  Unless he seeks immediate relief by way of a prerogative writ, the defendant must show that the error resulted in a miscarriage of justice, within the meaning of article VI, section 13 … of the state Constitution, i.e., he must convince the appellate court that the delay, in some material way, affected his ability to present a defense to the charge [citation]." (*People v. Rodriguez* (1971) 15 Cal.App.3d 481, 484, fn. omitted; see *Chuong*, *supra*, at p. 1311.)  The record before us "indicates no such prejudice" to J.B.  (*People v. Rodriguez*, *supra*, at pp. 484–485.) Furthermore, in his briefs, while J.B. repeatedly asserts that the delay was prejudicial,  he never specifies why.  "Consequently, we reject his claim that the court's order must be reversed based upon the violation of his speedy trial right." (*Chuong*, *supra*, at p. 1312.)[2]

---

[2]     Accordingly, we need not address either J.B.'s alternative claim of ineffective assistance of counsel  or the Attorney General's claim of forfeiture.

## **DISPOSITION**

The juvenile court's adjudication and orders are affirmed.


MEEHAN, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


DeSANTOS, J.

15.