Filed 5/22/15  P. v. Wilson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058507 |
| v. | (Super.Ct.No. FSB033934) |
| GEORGE HOWARD WILSON, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed with directions.

Catherine E. White, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant, George Howard Wilson, guilty of (1) second degree murder (Pen. Code, § 187, subd. (a)),[1] and (2) assault on a child under eight years old resulting in death (former § 273ab). Defendant admitted suffering one prior conviction, which constituted both a strike (§ 667, subds. (b)-(i)) and a serious felony (§ 667, subd. (a)). The trial court sentenced defendant to prison for a determinate term of five years and an indeterminate term of 50 years to life.

Defendant raises three issues on appeal: (1) defendant contends his rights to due process and a fair trial were violated by the admission of uncharged offense and gang evidence; (2) defendant asserts the trial court erred by rejecting his claim of ineffective assistance of counsel without conducting an adequate inquiry; and (3) defendant contends there is an error in the abstract of judgment. We affirm with directions.

## I. FACTUAL AND PROCEDURAL HISTORY

A. *Prosecution's Case*

Defendant began dating Anetria Allen (Allen) in December 2001. At that time, Allen had two children: (1) M.M.1 (the victim), a boy who was born in April 1999; and (2) M.M.2, a boy who was born in April 2000.[2] In January 2002, Allen moved into an

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Allen testified she had a daughter who was born in September 2002—after she began dating defendant. However, she also said her daughter was living in the apartment in February 2002. Defendant said he took care of Allen's two sons and daughter. Accordingly, we infer Allen's daughter was born in September 2001 (not 2002), and she likely had three children at the time she began dating defendant. At the

*[footnote continued on next page]*

2

apartment. Defendant stayed with Allen and her children approximately four nights per week. Soon after Allen moved into the apartment, in January, defendant became abusive toward Allen and the victim.

On February 26, the victim was ill; he had been vomiting for several days, but was still able to eat food and was active. On that day, Allen left the victim with defendant while she went to the store to purchase medicine and juice for the victim. When Allen left the apartment, the victim was asleep in his bedroom and defendant was asleep in the living room. Defendant can be violent when awakened. Allen was gone from the apartment for approximately one hour.

When Allen returned from the store, she found the victim lying in his bed. The victim was unresponsive. The victim's diaper was torn halfway off and he had tears in his eyes as though he had been crying. As Allen checked the victim, defendant stood nearby saying, "I'm sorry." Allen performed cardiopulmonary resuscitation (CPR) on the victim and called the paramedics. Defendant left the apartment prior to Allen calling the paramedics. Allen did not see defendant again, other than in court.

A medical examination of the victim reflected a bruise in the center of his forehead, a bruise on the right side of his jaw, a bruise on the left side of his eye, and healing scrapes on his face. The victim also suffered "a very extensive skull fracture" that "cover[ed] most of the occipital bone down to the base of the skull [a]nd then went

*[footnote continued from previous page]*
time Allen testified in March 2012, she had seven children. The victim was her first born (eldest) child.

3

into another bone on the right side and then across to the left side of the skull." The victim's brain was "very injured"; it was "swollen or damaged" and it was hemorrhaging. The brain injuries occurred "shortly before the death," which means the injuries occurred within hours, as opposed to days, prior to the victim's death.

The victim was in a coma at the hospital, and placed on a ventilator because he could not breathe on his own. The victim was unable to breathe on his own because of his brain injury. It appeared, to the Chief Medical Examiner for the San Bernardino County Coroner's Office, that the victim's head was moving when it suffered multiple instances of blunt force trauma, e.g., being slammed into an object. The police found dents in Allen's apartment wall, suggesting the victim's head was slammed against it. A black hair was recovered from one of the wall dents, and a small amount of the victim's blood was found on the wall. The victim had black hair.

In addition to the head injuries, the victim also suffered blunt force trauma on his abdomen. The abdominal injury was fresh, occurring "shortly before death." The victim suffered hemorrhaging or bruising at the back of his abdomen, which was "caused by one blow straight into the abdomen." The victim's pancreas and bowel were crushed against his spinal column, which caused the bleeding. Essentially, the fist or other object that struck the victim, struck him with enough force that it reached the victim's spinal column through the front of the victim's body. The victim died approximately 12 hours after arriving at the hospital. The cause of death on the victim's death certificate was listed as "abusive head trauma due to battered baby syndrome."

4

Defendant was interviewed by law enforcement officers from the San Bernardino County Sheriff's Department and San Bernardino City Police Department. Defendant said the victim was ill when the victim returned home on Thursday, February 21, from visiting his biological father (Father). Defendant said he was on the telephone, on February 26, while Allen was at the store, and when he hung up, he heard the victim panting as though he could not breathe. Defendant went into the victim's room and saw he was drooling, which was when Allen arrived home. Defendant said the victim had vomit in his throat when defendant tried to perform CPR on him.

Defendant denied ever striking the victim or Allen. Defendant said Father failed to provide for and did not spend much time with the victim. Also, Father approached defendant with a baseball bat and made references to being a gang member. The baseball bat confrontation with Father ended when defendant pointed a gun at Father.

As the interview continued, defendant admitted he "whipped" the victim, but denied "crack[ing] his head." Defendant said he had "just left the mental hospital for these situations," but he knew he "didn't black out or do that to [the victim]." Defendant said: "I fuckin been in a mental hospital all my fuckin life. Same reason . . . . Blacking out, hit my mom . . . . Don't remember. It's all . . . . This didn't just start now. It ain't just started now. I can't believe I did it."

Defendant mentioned "split personality" disorder. He also said he smoked PCP and had "blackouts all the time." However, defendant denied having PCP in his system

5

and said he had not used PCP for years. Defendant said he had blackouts as a child, prior to smoking PCP.

Also during the interview, defendant said the victim sustained his injuries by falling down the stairs outside the apartment. Defendant said: "It happened outside. I knew he was sick. He come to my room, and I told him to go over [to] his auntie's house.[3] I knew he was sick, and he fell down the stairs. I went outside and picked him up. He fell down the stairs . . . busted his head on the ground, on the steps or something. I don't know." Defendant said he felt responsible for the victim falling, because defendant knew the victim was sick, dizzy, and "barely walking" prior to the fall. Defendant told the victim to go to his aunt's house because defendant was angry the victim woke him by crying. Defendant said the victim was "breathing funny" when he laid the victim on the bed.

Also during the interview, defendant said he pushed the victim out of the apartment with enough force that the momentum from the push caused the victim to fall down the stairs. However, defendant said he did not intend for the victim to fall. After defendant pushed the victim out of the apartment, defendant "slammed" the door behind him. Defendant discovered the victim at the bottom of the stairs after hearing him fall. Police interviewed other residents of the apartment complex. No one saw or heard the victim fall down the stairs.

---

[3] The victim's aunt "stayed around the [apartment] complex."

6

B. *Defense's Case*

Defendant testified at trial. Defendant said he was asleep when Allen left the house, and he awoke when the telephone rang. As defendant spoke on the telephone, the victim came out of his bedroom crying. Defendant thought the victim was crying because he wanted to go outside, so defendant "pushed him out[side]." However, defendant did not push the victim toward the stairs, because "[t]hat's not how the door open[s]"—the door opens toward the neighbor's apartment. Defendant was not angry when he pushed the victim outside.

Defendant closed the door after the victim exited the apartment. Defendant laid down and "kind of closed [his] eyes," and then heard noise on the wooden stairs outside. Defendant "jumped up" and opened the door. Defendant saw the victim falling down the stairs. Defendant ran down the stairs, and picked up the victim from the landing area, where he was laying on his back. Defendant took the victim to the victim's bedroom. As defendant was checking the victim for cuts and bleeding, Allen entered the room.

Allen went to get help. When Allen returned, she was with a nurse. Defendant performed CPR on the victim. When the paramedics came, defendant hugged Allen and told her he was sorry. Defendant apologized because he felt responsible for placing the victim outside. Defendant stayed at the apartment and was there when police arrived later in the day.

Defendant did not initially tell the law enforcement officers about the victim falling down the stairs because defendant does not trust the police and felt the officers would "twist [the] story the way they wanted it." Defendant said he lied about having been in a mental institution because there "was too much going on" during the law enforcement interview.

A forensic pathologist, who consults in criminal defense matters, said the abdominal injury the victim suffered could have caused vomiting, e.g. the vomiting the victim had been suffering in the days prior to his death, after returning from Father's house. The doctor opined the victim's head injuries were more consistent with a fall down a flight of stairs than being slammed into a wall.

## II.  DISCUSSION

A.  *Gang and Uncharged Offense Evidence*

1.  Procedural History

(a)  *Motions in Limine*

Defendant's trial counsel, Richard Berkon (Berkon), filed motions in limine. Berkon requested the court to exclude evidence of (1) defendant's gang affiliation, since gang allegations were not part of the case, (2) the baseball bat and gun incident involving defendant and Father, since firearm allegations were not part of the case, and (3) the alleged PCP residue found in a container in Allen's apartment, since there was no evidence reflecting defendant had PCP in his system at the time of the offense.

8

The People asserted there would be evidence of defendant's PCP use introduced during defendant's recorded interview with law enforcement. The People argued the police officer who smelled the container holding the alleged PCP residue would provide the foundation for his opinion that the substance was PCP, e.g., the officer smelled the container. The court ruled: "It's relevant because of [defendant's] own statement." The court explained defendant had "put[] his own mental state at issue" by blaming PCP for his violent behavior. The court found the PCP evidence was not prejudicial "given the nature of the crimes charged."

The People asserted the evidence of the altercation with Father was relevant to defendant's mental state. The People argued the victim "died alone" with defendant, which meant the People had "heavy lifting . . . to do . . . to help this jury understand how someone could do this to a child, inflict this kind of injury on a child." The People asserted they needed to establish a "confluence of factors," not a single incident, caused defendant to inflict lethal violence on the victim.

The People explained that during the baseball bat/gun incident, Father and defendant referred to their respective gang affiliations. The People believed the conflicting gang affiliations, drug use, and sick child vomiting on defendant came "together in a perfect storm. And [defendant] los[t] it." The People asserted that was their "theory of the case."

The trial court questioned if the gang evidence was too inflammatory. The People asserted there was other evidence that was more inflammatory, such as the

9

autopsy photographs and the recorded law enforcement interview wherein defendant lied to the officers. The prosecutor argued: "[I]f the jury's emotions aren't stirred already, I don't think gang membership is going to do a whole lot to stir up emotions."

Berkon argued the gang evidence was highly inflammatory, because it would cause the jurors to "throw up their hands" and convict defendant solely because he is affiliated with a gang. Berkon contended there was no evidence defendant was motivated to murder the victim due to Father's gang affiliation. Berkon concluded the gang evidence was more prejudicial than probative.

The trial court asked how the gang evidence would be presented. The People explained it would come in through defendant's interview with law enforcement, where defendant made statements about his gang affiliation in response to questioning. The People also planned to call a gang expert and possibly use defendant's statements from his prior trial, if defendant did not testify at this trial.[4]

The trial court said defendant could argue the victim's abdominal injuries were sustained during the victim's visit with Father—the injuries were not inflicted by defendant. Due to that possible theory, the court concluded the relationships between Allen, defendant, and Father were relevant, because it was "relevant to give a full context of the circumstances surrounding this child's life." The court explained there are "some significant unknowns" in the case, given the illness the victim was suffering

---

[4] Defendant's first trial relating to these charges resulted in a deadlocked jury and a mistrial.

10

prior to his death and the possibility the illness was caused by the abdominal injuries. Therefore, the court found "the father's involvement is plainly relevant" and the conflict between defendant and Father was relevant.

The court explained the fight with Father was not prejudicial. The court said: "I can't imagine the jury being inflamed against the defendant or biased against the defendant because he merely had a fight with the biological [father], even if that fight was needlessly violent." Therefore, the court ruled evidence of the altercation between defendant and Father could be introduced.

In regard to the gang evidence, the trial court concluded it was "potentially prejudicial." The court said there would not be evidence of the gang's various violent acts, but the People could introduce evidence of defendant being affiliated with a gang. The court said: "I think the only relevant issue here is precisely the rivalry of the gangs involved." The court said it would be inclined to give the jury a limiting instruction reflecting the gang evidence was only relevant to defendant's motive or mental state, as opposed to being evidence of defendant's disposition to commit violent crimes. The trial court concluded that the "rivalry is relevant," and not "particularly prejudicial," given the nature of the charges in this case."

In regard to the firearm evidence, the People asserted it was relevant to defendant lying to law enforcement officers. The People explained defendant lied to the detective when he initially said he confronted Father with a knife, as opposed to a firearm. Defendant said he lied to avoid a parole violation. So, the evidence was relevant

11

because it showed defendant lied. Berkon argued the firearm evidence was not relevant because the victim was not shot. Berkon argued possession of a firearm is not relevant to determining whether the victim sustained his injuries from a negligent or intentional act.

The trial court explained: "I keep coming back in my thinking that so many of these issues are made relevant by the [defendant], in his statements to police. He brings up, or at least discusses—answers questions about various topics. And the full breadth and scope of those statements, albeit in their redacted form, that's a big part of the case . . . ." The trial court found the gang, drug, altercation, and firearm evidence "give[s] life, if you will, to the context in which the defendant's statements are made." Therefore, the trial court permitted the People to introduce evidence of defendant possessing a firearm.

(b) *Trial Evidence*

Allen testified defendant's income came from selling marijuana at Allen's apartment. Allen also said she was aware of defendant using PCP. Allen explained she became fearful of defendant after moving into the apartment because defendant "had friends that [were] bad and [were] in gangs," which caused Allen to be scared. Allen said defendant admitted to her he was a member of a gang known as 99 Mafia. Allen also said defendant "pulled a gun on [her]" after she questioned defendant regarding injuries the victim received during a separate incident. Defendant told Allen the victim

12

had a bruise on his head and a split lip due to falling and hitting his head on the sink. When Allen questioned defendant, defendant brandished the firearm.

During defendant's recorded law enforcement interview, defendant said he was not a gang member, but had been a gang member when he was younger. Defendant said he carried a firearm when he was younger, but no longer used guns. Defendant told the detective he scared Father away, during the altercation, with a knife. The detective told defendant .40-caliber bullets were found in a duffle bag, along with male clothes, in Allen's apartment. Defendant admitted he owned the bullets, but said he had given the gun to a friend. Defendant admitted pointing the gun at Father during the altercation. Defendant explained he lied about using the firearm because he did not want to incriminate himself since he was on parole. Defendant said that during the altercation with Father, Father spoke about East Coast Crips. Also during the police interview, defendant said he smoked PCP and had "blackouts all the time." However, defendant denied having PCP in his system and said he had not used PCP for years.

San Bernardino City Police Detective Plonski (Plonski) testified at the trial. Plonski explained it is a crime and a violation of parole for a parolee to possess a firearm. During the search of Allen's apartment, drugs were found. Marijuana was found in clear plastic bags in the kitchen. Also in the apartment, an officer found "a small clear vial that had a black top that had the odor of PCP." Plonski said he gave the information about defendant's friend, to whom defendant gave the firearm, to the police

13

department's narcotics unit, because the friend was allegedly selling narcotics. The officers did "a control buy," arrested the friend, and found a .40-caliber Glock handgun.

When defendant testified at trial, he denied having been a gang member. The prosecutor asked defendant if he had "99th Street" tattooed on his back, and defendant confirmed he did. Defendant explained law enforcement would consider 99th Street Mafia to be a gang, but it was not a gang, rather, it was a group of "hustlers." Defendant explained when he admitted, during the police interview, to carrying a gun when he was younger, he meant during his military service—not during his time in the 99th Street Mafia. Defendant explained he lied to police about being in a mental hospital and about hitting his mother.

Defendant testified Father told defendant Father was a member of the East Coast Crips. Defendant again explained he (defendant) was not a gang member and had "no problem" with "where [Father] was from," especially since Father and Allen had many of the same friends. The prosecutor asked if defendant's prior conviction for armed robbery was part of his gang involvement. Defendant denied it was gang activity.

In rebuttal, the People called Los Angeles County Sheriff's Detective Libe (Libe) as a gang expert. Libe testified 99th Street Mafia was a criminal street gang. Libe explained 99th Street Mafia engages in "petty theft, grand theft, vehicle theft, narcotics[] sales, prostitution, gambling, armed robberies, strong-armed robberies, assaults with firearms, possession of firearms, murders, kidnappings, and witness intimidation." Libe explained that, in gang culture, "hustling" meant "making money

14

through illegal activities, primarily through gambling, prostitution, [and] selling stolen property." Libe opined defendant's "99 St" tattoo, was consistent with tattoos that would be seen on members of the 99th Street Mafia.

Libe also testified East Coast Crips was a criminal street gang, which engaged in the same type of activities as the 99th Street Mafia. Libe explained East Coast Crips and 99th Street Mafia were not rivals; however, the individual members of the gangs may have conflicts with one another so that individual gang members become rivals with people from the other gang.

### (c) *Jury Instruction*

During a discussion on jury instructions, the court and attorneys discussed a limiting instruction concerning the gang evidence. (CALCRIM No. 1403.) Berkon, defendant's counsel, objected to giving the instruction to the jury. Berkon asserted the evidence reflected (1) defendant was, or may have been, a gang member "quite some time ago," and (2) there was no rivalry between defendant and Father due to gang issues. Therefore, Berkon asserted there was nothing indicating the killing was motivated by gang rivalry. Berkon asserted the jury instruction had no probative value.

The trial court explained that without the limiting instruction, it could still be argued the crime was motivated by gang rivalry, but the jury would not know to limit the use of the gang evidence. Berkon clarified he was objecting to the instruction on the basis no argument related to gangs could be made, based upon the evidence reflecting there was no gang rivalry. The trial court concluded: "I do believe there is sufficient

15

evidence before the jury that makes this instruction proper." Berkon responded: "Given that ruling, I'm okay with the instruction as limited."

The trial court instructed the jury as follows: "You may consider evidence of gang activity for the limited purpose of deciding whether the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness. [¶] You may not consider this evidence for any purpose other than those just described. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." (CALCRIM No. 1403.)

The trial court also instructed the jury on uncharged offense evidence. (Evid. Code, § 1101, subd. (b); CALCRIM No. 375.) The instruction informed the jury that if the People proved defendant committed the uncharged offenses, then the evidence could be used for the limited purpose of determining whether (1) defendant had a motive to commit the charged crimes, (2) defendant knew his act or actions were dangerous to human life, and (3) defendant's act or actions were the result of mistake or accident. The instruction informed the jury it could not consider the evidence for purposes of determining whether "defendant has a bad character or is disposed to commit crime."

16

2. Analysis

(a) *The Trial Court Erred in Allowing Into Evidence Defendant's Alleged Gang Affiliation, His Chasing Father With a Gun, and Certain Evidence as to Defendant's Recent PCP Use*

Prior to trial, defendant moved to exclude from evidence any reference to (1) his alleged gang affiliation, (2) an incident occurring approximately one week before the victim's death in which defendant pulled a gun on Father, and (3) his use of PCP. The motions were denied. Defendant claims these rulings were in error.

As to defendant's alleged gang affiliation, the incident involving the gun, and defendant's recent PCP use, we believe the court erred. There is simply no evidence to suggest that defendant's gang affiliation or the fact that he pulled a gun on Father is indicative of, or are bases from which to infer, that defendant had a motive to assault the victim. Additionally, there was simply no nexus between defendant's PCP use and the victim's death. Further, even if there was some attenuated relevance of the evidence, its probative value was substantially outweighed by its undue prejudice.

Evidence of prior uncharged acts is not admissible to prove a defendant's bad character or to prove his conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) It may only be "admitted if relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident . . . . [¶] . . . [¶] 'Evidence of uncharged [acts] "is so prejudicial that its admission *requires extremely careful analysis*."'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 714; Evid.

17

Code, § 1101, subd. (b).) Evidence of uncharged acts creates an inherent risk of undue prejudice in that a jury may prejudge a defendant and the credibility of his evidence based on extraneous factors. As a result, evidence of uncharged acts ""are admissible only if they have *substantial* probative value.""" (*People v. Lopez, supra,* at p. 715.)

(i) Gang Evidence

"[T]he California Supreme Court has condemned the introduction of [gang] evidence if it is only *tangentially* relevant to the charged offenses. [Citation.] In fact, in cases not involving gang enhancements, the Supreme Court has held evidence of gang membership should not be admitted if its probative value is minimal. . . . [¶] . . . [E]vidence of defendant's gang membership although relevant to motive . . . creates a risk the jury will improperly infer defendant has a criminal disposition and is therefore guilty of the charged offense and thus must be carefully scrutinized." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223-224.)

In allowing gang evidence, the trial court variously indicated: "[I]t seems that [Father]'s involvement is plainly relevant and the conflict between [defendant] and [Father] is relevant as one of the—one of tributaries, if you will. . . . [¶] . . . [¶] And analytically, where that takes me is to the question of gang evidence. . . . I think that based on the People's offer of proof, namely that the gang evidence will be limited in this case to the fact that, A, the defendant admitted membership in this case; B, [defendant] believed that [Father]—the biological father was a member of the other gang, makes that statement to declaim any motivational power that—that gang

18

membership might have . . . . [¶] . . . [¶] . . . The gang expert to merely say that the defendant's and [F]ather's gang[s] are rivals and have a history of acting violently towards each other."

This we believe, is total speculation. There is nothing in the present record to suggest that gang rivalry played any motivational role in the present incident. The essence of the prosecution was that defendant, in a moment of anger, exploded on the victim, causing life-ending injuries. There was no evidence to suggest that defendant thought through any of his conduct or was moved to his conduct by anything other than a spur-of-the-moment decision. "[T]he gang evidence was [simply] used to create a motive not otherwise suggested by the evidence." (*People v. Albarran, supra,* 149 Cal.App.4th at pp. 225-226.)

The error was accentuated when a prosecution rebuttal witness was allowed to testify that defendant's gang, the 99th Street Mafia, was a criminal street gang that engaged in "petty theft, grand theft, vehicle theft, narcotic[] sales, prostitution, gambling, armed robberies, strong-armed robberies, assaults with firearms, possession of firearms, murders, kidnappings, and witness intimidation."

Further, and while the court initially indicated it would allow mention of gang membership for purposes of motive, the court, in fact, instructed the jury that it could

19

also consider evidence of gang involvement, "when you evaluate the credibility or believability of a witness."[5]

Given the substantial risk of prejudice created by the gang evidence and its attenuated relevance to motive, we believe the trial court abused its discretion in allowing the evidence before the jury. (*People v. Myers* (2014) 227 Cal.App.4th 1219, 1224 [trial court's ruling on Evid. Code, § 1101, subd. (b) evidence is reviewed under abuse of discretion standard].)

### (ii) Gun Evidence

The gun evidence should also have been excluded. Its proffered relevance was that defendant, in his interview with Plonski, initially stated that a week before the victim's death, defendant chased Father with a knife; later in the interview, he indicated that it was with a gun, not a knife. Its relevance was therefore to bolster the prosecution's position that defendant's ever changing story was not credible.

In response to defense counsel's argument that gun possession was not relevant to the ultimate issue presented, the trial court indicated: "I—again, I don't think that's wrong except that I also accept that's not why the People are bringing it in, as such. This is just straight—well, I mean—actually I won't re-characterize—I won't rephrase—reconstitute your statements. I think the People stated them well about why they would bring this evidence in. I don't think there's anything prejudicial about

---

[5] We can find no case in which this instruction was found appropriate when there are no underlying substantive gang charges or enhancements. Further, the only witness with gang connections that testified in the present matter was defendant.

20

having a gun, as such. [¶] . . . [¶] . . . In most cases, we—the Court would exclude this pretty much automatically. But this case is different, because it all goes into [defendant's] motivation to give statements."

It must first be noted that whether defendant chased Father with a knife as opposed to a gun was irrelevant as to whether defendant killed the victim or the manner in which he did so. The issue is clearly peripheral to defendant's guilt or innocence. *People v. Lavergne* (1971) 4 Cal.3d 735 is instructive. There, the defendant and three others robbed a clothing store of clothes. One of the defendants, James Oliver, pled guilty to second degree robbery in exchange for his testimony. Immediately before the robbery, Oliver drove his car, with two codefendants, to an area a couple of blocks from the robbery. During his testimony against the defendant, Oliver alluded to his car a number of times. On cross-examination by defense counsel, Oliver was asked where he got his car. He testified that he had purchased it. "The defense attorney then asked him if it was stolen, to which he replied that it was not. The defense then sought to impeach Oliver's credibility by introducing testimony to show that the automobile was stolen." (*Id.* at p. 741.) The judge sustained the prosecutor's objection under Evidence Code section 352. On appeal, the trial court was affirmed. The appellate court explained: "While collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury. . . . [¶] California courts have, in cases similar to this one, held the court's exclusion of collateral facts offered for impeachment purposes

21

to be a proper exercise of the trial judge's discretion.  In *People v. Atchley* [(1959)] 53 Cal.2d 160, . . . defendant was on trial for the murder of his wife.  Defendant attempted to impeach a prosecution witness by showing that she had forged rent receipts for the deceased to deceive the welfare department after she testified on cross-examination that she never forged a rent receipt.  That case, like this one, involved an attempted impeachment of a prosecution witness on a collateral matter involving a crime with which the witness was neither charged nor convicted.  In that case we held that the trial court had discretion to foreclose further inquiry into the forgery issue, even for purposes of impeachment." (*People v. Lavergne, supra,* at pp. 742-743, fn. omitted.)  And, with special application to the present matter, "[a] witness may have a strong reason to lie about the collateral fact which reason would furnish no motive to lie in his other testimony.  Where such a situation exists, the possible inference that a witness false in part of his testimony is not to be trusted as to other parts is weakened." (*Id.* at p. 743; see *Winfred D. v. Michelin North America, Inc*. (2008) 165 Cal.App.4th 1011, 1029-1035.)[6]

While it is clear that the trial court, in the exercise of its discretion, may allow impeachment on a collateral matter, the court must nonetheless closely scrutinize the prejudicial effect of the collateral impeachment.  Here, the effect created by evidence of

---

6 Defendant was a convicted felon; as such, he would be culpable of being a felon in possession of a firearm.

defendant chasing Father with a gun is that defendant is a violent and explosive human being.

There has been some suggestion that the gun evidence was relevant to show that defendant responds violently when angered and therefore on the occasion in question, he responded violently. This is exactly what Evidence Code section 1101 subdivision (a) prohibits. Evidence of specific instances of conduct on one occasion is inadmissible when offered to prove that defendant responded similarly on the subsequent occasion.

As stated by defense counsel at the conclusion of arguing the pretrial motions: "[J]ust to add to that prejudicial effect. I think it's a matter of also dirtying up [defendant] instead of having the jury focus on what the ultimate issue is. It's okay. He's a gang member. He's got prior convictions. He's—he's got guns and bullets. It's dirtying him up and leading them astray. It's not relevant to anything they have to prove. That's where I think the prejudicial value lies."

### (iii) PCP Evidence

The court also erred in allowing much of the PCP evidence before the jury. We begin by noting there was no evidence that defendant was under the influence of PCP or was coming down from being under the influence. While a small container with possible PCP residue was found in the common area of the residence, there was no evidence that defendant had ingested any of it. The testimony by defendant was that the night before the incident in question a friend of the victim's mother smoked it. The victim's mother testified that while she believed defendant smoked PCP, he did not do

23

so around the residence. Further, when defendant was contacted by the police on the day of the incident, there was no indication that defendant was under the influence of any drug. Lastly, there was no expert testimony whatsoever as to the effects of PCP or one's response when coming down after ingesting it. As such, the court erred in allowing into evidence the facts that defendant was a PCP user and that PCP residue was found in the premises. There was simply no demonstrated nexus between the PCP and the victim's death. The undue prejudice is clear.

In our mind, the only admissible evidence as it relates to defendants usage of PCP, was his statement to Plonski indicating that in the past when he took PCP he would occasionally black out and do things he did not remember (i.e., inflict life-ending injuries on the victim). While we do not believe the statement has relevance to defendant's conduct immediately preceding the victim's death, we do find it admissible and probative of defendant's credibility. Clearly, the statement was offered by defendant as exculpation for his conduct, and was inconsistent with his later relatively clear explanation of the victim falling down the stairs. (See *People v. Brooks* (1966) 64 Cal.2d 130, 139.)

(b) *Harmless Error*

Having concluded the court erred in allowing in the above evidence, the issue becomes whether the errors were harmless. We disagree with defendant that the evidentiary errors were of such a nature as to render the trial arbitrary and fundamentally unfair. As such, we believe it appropriate to address the errors under

24

state law and determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. [Citations ['reasonable probability' does not mean 'more likely than not,' but merely 'probability sufficient to undermine confidence in the outcome'].]" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

On count 1, the jury was instructed on second degree murder and involuntary manslaughter. On count 2, it was instructed on assault of a child under eight years old resulting in death and child abuse likely to produce great bodily harm. Defendant was convicted of second degree murder and assault of a child under eight years old resulting in death. As such, the question becomes whether in the absence of the gang, gun, and PCP evidence there is a reasonable chance the jury would have convicted defendant of involuntary manslaughter rather than second degree murder and/or child abuse likely to produce great bodily injury as opposed to assault resulting in death.[7]

Before discussing the medical evidence, we feel it necessary to discuss defendant's credibility. In his interview with Plonski, defendant initially denied any involvement or knowledge as to what happened to the victim. He further indicated that he did not hit the victim's head against the wall. Thereafter, in an interview with

---

[7] Other "more favorable result[s]" would be an acquittal or a hung jury. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

25

Michelle Gamboa of the San Bernardino County Sheriff's Department, he admitted to being upset with the victim and leading the victim outside and closing the front door. Defendant indicated that thereafter the victim fell down the stairs; defendant went to the bottom of the stairs and retrieved the victim. Plonski picked up the questioning at this point and continued to pursue defendant's indication that the victim fell down the stairs. Defendant told Plonski that he heard the victim fall down the stairs and went outside and the victim was already on the bottom landing. Shortly thereafter, defendant told Plonski that after putting the victim outside, he was about to lie down, and heard a "vloom, vloom, vloom" outside; he went out and observed the victim falling down the stairs, probably a quarter of the distance down. A little later in the interview, defendant agreed with statements by Plonski that while he was not trying to throw the victim down the stairs, he did give the victim a "little extra momentum (unintelligible) the stairs . . . [which] caused [the victim] to spin and fall down the stairs." At trial, defendant testified that he simply put the victim outside of the front door—heard the victim fall—went outside and saw the victim about one-quarter of the way up from the bottom of the stairs. Defendant then went down the stairs and retrieved the victim from the bottom.

Clearly, there is not total consistency between defendant's various versions as to evidence properly before the jury.[8]

---

[8] As earlier discussed, the court erred in allowing gang evidence as to motive. The error was exacerbated by defendant being impeached as it related to his membership in a gang. In his statement to Plonski, defendant indicated that he used to be a member of the 99th Street Mafia gang and that at that time he carried a gun. At

*[footnote continued on next page]*

Further, as it relates to the error in allowing the gun evidence relative to defendant chasing Father, the fact that defendant did use a gun came before the jury. The victim's mother testified without objection that at some point in time before the present incident, the defendant pulled a gun on her.[9]

As to the medical evidence, testifying for the People were Dr. Frank Sheridan, who performed the autopsy, and Dr. Claire Matney, who saw the child when he was admitted to Loma Linda University Medical Center. Dr. Sheridan testified that the victim's head was in motion when the injury occurred. It was a blunt force head injury with elements of motion involved. There were a total of four impacts to the head. There was a contusion in the center of the forehead, the temple area, and one in the back. The injury to the back of the head was the major one. Once the child received this head injury, there was no possibility he could act normally afterward; he would have been incapacitated immediately.

Dr. Sheridan opined that throwing the victim down the stairs could have caused the injuries, but he does not believe that a simple fall on the stairs would have caused this head injury. The velocity in falling down the stairs was unlikely to have caused something of this nature. One possibility is that the victim was thrown over a stairway

---

[footnote continued from previous page]
trial, he denied any membership in the gang to the extent it was a criminal street gang and denied carrying a gun, in conjunction therewith.

[9] With this said, however, after failing to keep out the gun evidence as it related to Father, it would probably have been futile to object to this evidence.

and landed on the back of his head, which is the major impact, and then continued to fall and picked up the other fractures with less velocity. Another possibility is that the victim was slammed once and then thrown down the stairs, but not as far. Another scenario is that the victim was slammed against the wall or the floor. The harder the surface the victim makes contact with, the more consistent it is with the largest fracture to the back of the head.

Four separate impact points to the scalp is more consistent with going down the stairs than going up against a wall. The four impact points could have been produced on the stairs or some produced on the stairs and others by another mechanism. Skull fractures in children can occur as a result of a short fall. Dr. Sheridan did not see any scalp injuries externally.

If the victim was thrown down stairs, it would explain the head injury but not the abdominal injury, which involved the small bowel, large bowel, and pancreas. The abdominal injury, while it did not cause death, was a serious injury. There was a blunt force blow straight into the abdomen. The abdominal injuries would not occur by accidental conditions. It would not have happened by falling down the stairs. There is no mechanism for it to happen. The abdominal injury had to be an impact straight into it, missing the rib cage. If a person is falling, an injury of this nature does not happen unless it smashes the ribs as well. One of the clinical indicators of a disease or injury to the pancreas is an elevated amylase, but it takes time to go up after it is injured; when the victim was admitted to St. Bernadine Medical Center, the amylase was at a normal

28

level.  The fact of the elevation supports a fresh injury to the abdominal area.  The bowel injury occurred about the same time the head injury did.

Both blunt force injuries occurred shortly before death.  It was not a matter of days.

Dr. Matney's testimony was consistent with Dr. Sheridan's.  Additionally, she testified that at the time she saw the victim at Loma Linda University Medical Center she did not observe any scrapes on his hands or wrists nor any open bleeding wounds about the head.  She did observe some bruising on the right wrist.

In response, defendant called Dr. Harry Bonnell, a pathologist, and Dr. Daniel Vom Hof, a biomechanical expert.  As to the mechanism of injury, Dr. Bonnell testified that the large impact site with extensive hemorrhage would be rare in a fall down the stairs.  As to whether the multiple impact points in the head are more consistent with a slam against a wall or a tumble down stairs, would depend on whether it was a head-over-heel fall or a rolling down the stairs.  On a head-over-heel fall there could be significant rotational force.  He would doubt, absent further impacts, that a child in a standing position and falling to the third step could cause as big a fracture as was present.  He believes it possible, depending on how the child falls, that a fall down the stairs could cause the injuries.  A tumble down the stairs is more consistent with the multiple impacts than only one impact.

Dr. Bonnell further testified that the injury to the abdomen was from a blunt force trauma.  If left untreated, the abdominal injury would not cause death.  Consistent

29

with the defense theory that the abdominal injury was caused by Father on the Friday or Saturday preceding the victim's death, Dr. Bonnell testified that the victim's complaints before his death of pain in the stomach area and vomiting was consistent with this type of injury.

Dr. Vom Hof testified that he doesn't know how the victim fell, but if it was a straight trip and fall, enough "g" forces could be generated so as to cause the injuries. He further indicated that if the victim was thrown down the stairs it would greatly increase the "g" forces such that it would possibly compress the skull and there would be more brain damage than was present. Further, if the victim had been thrown down the stairs he would expect to see a broken shoulder or collar bone.

The present jury deliberated for approximately two and one-half days; over one-half day was spent on readback of testimony. The jury's concern as it related to the readback was Dr. Sheridan's testimony relative to bruises on the victim's face, head, and neck. The jury further had readback as it related to witness Allen's testimony as to what happened on February 26 (the date the victim received his injuries).[10]

---

[10] The first trial ended in a hung jury. As represented by counsel for the prosecution, the jury split 10 to 2 on count 1 and 8 to 4 on count 2. From our record, it is unclear as to what evidence came before the jury as it related to the evidentiary errors argued here. It would appear at the first trial that there was some evidence as to defendant's gang involvement. (See *People v. McDowell* (2012) 54 Cal.4th 395, 441 [the fact that the first trial resulted in a hung jury and occurred without the error, does not necessarily "establish prejudice"].)

While certainly the jury should have never heard the objectionable evidence, we cannot say that in the absence of said evidence there was a reasonable chance defendant would have achieved more favorable verdicts.

On matters properly before the jury, defendant appears to have had substantial credibility problems in terms of how the incident occurred. Further, the prosecution's medical evidence was extremely strong. In reviewing the record, it is inescapable that the catastrophic injury to the back of the head did not occur by the victim simply falling down the stairs. As Dr. Matney testified, a two year old weighing 20 pounds tumbling down stairs is not a high energy fall.

The defense evidence did little to rebut the overall impact of Drs. Sheridan's and Matney's testimony. Dr. Bonnell, while recognizing that some of the fractures could have been caused by a fall down the stairs, was unable to explain or attribute the fracture to the back of the skull to such a fall. As testified to, he would doubt that a child in a standing position and falling could sustain as big a fracture as was present.

As a whole, the medical evidence is compelling; the errors were therefore harmless.

B. *Ineffective Assistance of Counsel*

1. Procedural History

During trial, defendant was represented by Berkon, whom defendant had retained. The jury delivered its verdict on March 19, 2012. On April 20, at the bench trial for defendant's prior convictions, before the trial on the prior conviction allegations

began, defendant fired Berkon and said he wanted to represent himself. Defendant said he planned to file a motion for a new trial based upon ineffective assistance of counsel. The trial court granted defendant's request to be self-represented and continued the trial to May 4.

On May 4, defendant gave up his right to be self-represented and retained Michael Holmes (Holmes) to represent him. The court continued the trial to May 18. On May 18, defendant waived his right to a trial on the prior conviction allegations and admitted he suffered a prior conviction.

In September, Holmes filed a new trial motion. In the motion, it was alleged Berkon rendered ineffective assistance by (1) not sharing information about the case with defendant, (2) not allowing defendant to participate in making decisions about the case, (3) not calling a "crucial defense witness," (4) repeatedly telling defendant to "shut up," (5) not researching the issue related to admissibility of the gang evidence, (6) not contacting the biomechanics expert who caused the jury to hang in defendant's first trial, (7) failing to elicit testimony about the bloodstain on the wall, (8) failing to elicit testimony from the emergency room doctor about the lack of visible injuries on the victim, and (9) failing to contact a construction expert about the stains on the wall.

On December 5, the trial court held a hearing on the motion for a new trial. The court asked if the parties were ready to proceed. Holmes informed the court defendant was dissatisfied with the motion for new trial because he felt Holmes missed important points. Holmes said he believed the additional points defendant wanted argued could

not properly be raised. The court denied the request for defendant to file a supplemental motion.

The trial court explained it found Berkon's decisions to be reasonable tactical choices and the investigation Berkon conducted seemed thorough—the prosecutor had attached a declaration from Berkon in the opposition to the motion. The trial court then listened to argument from Holmes and the prosecutor. The trial court explained further investigation likely would not have changed the verdict because the People had been "quick to concede that the precise method of the injury being inflicted wasn't clear." The court denied the motion for a new trial.

The court then allowed defendant to make a statement. Defendant explained various problems he had with Berkon's representation, such as Berkon's failure to hire an investigator. The court said it did not want to relitigate the motion. Defendant said he would file a petition for writ of habeas corpus.

At the sentencing hearing on March 4, 2013, defendant claimed Holmes had abandoned him. Defendant said Holmes had filed the motion for new trial before defendant had an opportunity to review the motion. Also, during a telephone conversation, Holmes told defendant, "I'm done with you," and hung up the telephone. As a result of that conversation, defendant had not spoken to Holmes. Defendant said he "felt abandoned" due to Holmes's lack of professionalism. Defendant said he had not spoken to Holmes since the hearing on the new trial motion.

The trial court asked defendant if he was only informing the court that he had been unable to communicate with Holmes. Defendant said he was alleging Holmes provided ineffective assistance on the new trial motion. Defendant said Holmes was ineffective because "[h]e didn't address all of the things that he was paid to address." The court said: "I'm not sure if this is a *Marsden*[11] hearing. It sounds like it might be." Holmes responded: "I'm retained, your Honor." The court said to defendant: "What are you asking for? I need you to give me something like a bottom line. You have . . . a lot of complaints, but I don't know what you are asking for." Defendant said he was asking for time "to be prepared for sentencing." Defendant claimed Holmes was ineffective due to failing to raise issues of prosecutorial misconduct in the motion for new trial. Holmes said he did not believe there had been prosecutorial misconduct, and therefore, could not ethically file a motion based upon prosecutorial misconduct.

The trial court said it found Holmes's tactical decisions to be "entirely reasonable." Defendant argued Holmes rendered ineffective assistance because the trial court did not provide Holmes with the necessary transcripts. Holmes said he had the transcripts from "the first one."[12] Defendant again argued Holmes had abandoned defendant by "dodg[ing]" defendant and defendant's family.

---

[11] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[12] It is unclear if Holmes was referring to defendant's first trial, or something else.

The court asked if defendant was requesting a continuance. Defendant responded, "I want to be able to . . . address my issues." Defendant mentioned prosecutorial misconduct and police misconduct. Holmes explained he had addressed the issues with defendant. Holmes further stated he had accepted defendant's telephone calls, visited defendant in jail, had an investigator go to the jail, and communicated with defendant's mother via telephone and e-mail. The court denied defendant's request for a continuance and explained defendant could raise various issues in an appeal.

As the trial court began the sentencing portion of the hearing, defendant said: "I'm not accepting [Holmes] as my counsel." The court asked if defendant was asking to represent himself and if he was ready to proceed. Defendant said, "Yes." Defendant then said he would like to be sworn in, in order to give a statement of the case.

The trial court said: "[F]rankly, here's the way it looks: Every lawyer that [defendant] hires, then a new lawyer is hired to attack the competence of the lawyer that went before. This is a pattern that has emerged over this case." The court opined defendant's motion for self-representation was untimely, but the court would grant it if defendant could proceed with the sentencing hearing. The trial court warned defendant of the dangers of self-representation. Defendant said he did not understand. Defendant said he would allow Holmes to continue as his attorney if the court would allow defendant to allocute. Holmes advised defendant not to allocute, but defendant proceeded over Holmes's objection. The trial court permitted defendant to testify.

Defendant explained he had hired attorneys who failed to properly represent him. Defendant described police actions he believed were search and seizure violations. Defendant also alleged prosecutorial misconduct had occurred due to discovery violations. The court noted the sentencing hearing had lasted "for over an hour" and defendant had been allocating for approximately 20 minutes. The court said defendant had failed to set forth grounds for a new trial. Defendant responded he was "talking about mitigating circumstances." The court said defendant had failed to set forth mitigating circumstances and asked if defendant had anything to add because defendant was repeating himself.

Defendant again explained that his search and seizure rights and due process rights were violated and alleged that Holmes had abandoned him and provided ineffective assistance. After defendant spoke for 10 more minutes, the trial court said defendant had still failed to set forth grounds for a new trial. Defendant said he would like to argue a motion to compel discovery. The court denied the motion. Defendant asked the court to explain its reasoning. The court said: "I'm going to be done with [defendant]." The court asked if the prosecutor wanted to cross-examine defendant, and the prosecutor declined.

The court said it would proceed to sentencing. Defendant said: "I don't agree with your sentencing. I ask that—I ask that you Judge, since you [*sic*] trustee and this is your account, and I ask that you discharge it. I'm asking for, at this time, appearance— appearance bond—bond I asked from the DA. On my PR, I'm asking for a [*sic*]

36

appearance bond." The court said it was unsure exactly what defendant was requesting in regard to an appearance bond on his PR, but the court denied the request "for what it's worth." Defendant responded, "I accept that as dishonesty." The court proceeded to the sentencing of defendant.

2. Analysis

(a) *Contention*

Defendant contends the trial court erred by not conducting a proper inquiry into defendant's allegations of Holmes's and Berkon's ineffective assistance.

(b) *Attorney Berkon*

We address the issue as it relates to Berkon. The claims of ineffective assistance related to Berkon were raised in a motion for new trial. Since, at the time the motion was heard, Berkon had already been replaced by Holmes, there was no need for the court to consider a request for substitute counsel. The court only needed to rule on defendant's motion for new trial. (*People v. Reed* (2010) 183 Cal.App.4th 1137, 1145.)

The trial court reviewed the written motion and the prosecution's written opposition. The trial court listened to argument from both Holmes and the prosecutor. The procedure provided by the trial court was adequate. A trial court fulfills its obligations on a motion for new trial when it provides a "reasonable opportunity for oral argument." (*People v. Ashley* (1954) 42 Cal.2d 246, 270.) Accordingly, we conclude the trial court did not err because the court followed the correct procedures.

Defendant asserts the trial court erred because it did not follow the procedures related to a request to substitute attorneys for purposes of a new trial motion. Defendant relies on *People v. Stewart* (1985) 171 Cal.App.3d 388. In *Stewart*, the appellate court wrote: "Though it may be obvious, it is for analytical purposes useful to emphasize at the outset that the question whether to appoint new counsel to present a motion for new trial is distinct from the question whether [a] new trial is warranted." (*Id.* at p. 394.) *Stewart* concerned the question of whether to appoint new counsel to present a motion for new trial, i.e., appointing a different attorney than the one being accused of being ineffective. (*Id.* at p. 391.) Accordingly, defendant's reliance on *Stewart* is not persuasive because Holmes prepared the motion for new trial, not defendant's trial attorney (Berkon).

### (c) *Attorney Holmes*

In regard to Holmes, defendant stated Holmes was ineffective, but also that he would continue to allow Holmes to represent him. As a result, to the extent defendant wanted to substitute attorneys or represent himself, he did not make a clear request to that effect. If defendant had made a request for substitute counsel, a *Marsden* hearing would not have been appropriate, since Holmes was retained counsel. (*People v. Hernandez* (2006) 139 Cal.App.4th 101, 108.) A *Marsden* hearing would have been inappropriate because a defendant does not need to establish a retained attorney's incompetence in order to discharge the attorney. (*People v. Hernandez, supra,* at p. 108.) As set forth in *Hernandez*: "'The right of a nonindigent criminal defendant to

38

discharge his retained attorney, with or without cause, has long been recognized in this state [citations], and is governed by Code of Civil Procedure section 284, subdivision 2 [citations].[13]'" (*People v. Hernandez, supra,* at p. 107.)

Defendant was unclear as to what he wanted the court to do in relation to Holmes. Defendant said he believed Holmes was ineffective, but defendant also accepted Holmes's continuing as his attorney. The trial court repeatedly tried to determine what defendant wanted the court to do regarding Holmes. The court asked defendant: "[You're] saying that you didn't talk to your attorney before today's hearing; is that what this is?" The court asked: "What are you asking for?" The court requested that defendant "give me something like a bottom line."

As the conversation continued, the court asked: "[W]hat are you asking me to do?" As the hearing continued, the court asked: "You want a continuance; right, [defendant]?" Defendant said he wanted to "address my issues." Eventually, defendant said he wanted to allocute and the court permitted him to do so over Holmes's objection. The hearing, excluding sentencing, took over one hour.

It appears from the record the court was trying with great effort to determine the type of hearing defendant wanted the court to conduct. When defendant said he wanted to allocute, the court permitted the allocution. The court did not deny defendant a

---

**13** "Code of Civil Procedure section 284 provides, 'The attorney in an action or special proceeding may be changed at any time before or after judgment or final determination, as follows: [¶] . . . [¶] 2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other.'"

39

hearing. Rather, the court could not determine what hearing defendant wanted to take place. As set forth *ante*, a *Marsden* hearing was inappropriate, so the court repeatedly tried to determine what hearing defendant was requesting. Since defendant's requests were muddled, we cannot fault the trial court for not holding a hearing with a particular line of inquiry. In sum, the trial court did not err.

Defendant again relies on the *Stewart* case. *Stewart* applies *Marsden*'s procedural requirements to a determination of whether a new attorney should be appointed to argue a motion for new trial based upon ineffective assistance of trial counsel. (*People v. Stewart*, *supra*, 171 Cal.App.3d at pp. 391, 395-396.) *Stewart* involved appointed trial counsel. (*Id.* at p. 393.) Defendant's reliance on *Stewart* is unpersuasive because (1) it was unclear what hearing defendant was requesting, so the trial court could not be expected to understand defendant wanted to substitute counsel, and (2) *Marsden* procedures are inapplicable to retained counsel.

3. <u>Abstract of Judgment</u>

Defendant contends the abstract of judgment incorrectly reflects defendant was convicted of first degree murder. Defendant requests the abstract of judgment be amended to reflect a conviction for second degree murder. The People support defendant's request.

Defendant was convicted of second degree murder in count 1. The abstract of judgment reflects defendant was convicted of first degree murder in count 1. We will direct the trial court to issue an amended abstract of judgment changing "1st" to "2nd."

40

## III.  DISPOSITION

The trial court is directed to issue an amended abstract of judgment reflecting defendant was convicted of second degree murder in count 1.  The trial court is further directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  (§§ 1213, 1216.)  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


KING
                                                                                    J.


I concur:

HOLLENHORST
            Acting P. J.


41

I concur in the result reached by my colleagues. I write separately on the issue of whether defendant's rights to due process and a fair trial were violated by the admission of uncharged offense and gang evidence. I conclude the trial court did not err.

a)      Contention

Defendant contends the gang, drug, and firearm evidence was irrelevant to the charged crimes and therefore should have been excluded. (Evid. Code, § 352.) Defendant contends the admission of the evidence violated his rights to due process and a fair trial.

b)      Background Law

I apply the abuse of discretion standard of review. (*People v. Abilez* (2007) 41 Cal.4th 472, 500.) "Generally, the prosecution may not use a defendant's prior criminal act as evidence of a disposition to commit a charged criminal act. [Citation.] But evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . . ) other than his or her disposition to commit such an act.' [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

1

c)     Motive

(1)     *Law*

I examine whether the uncharged crimes evidence was properly admitted for purposes of establishing motive.[1] "Other crimes evidence is admissible to establish two different types or categories of motive evidence.  In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, the charged crime is effect.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381 (*Spector*).)  For example, a defendant robs a victim and is betrayed by a co-robber who takes all the proceeds of the crime.  The defendant then murders the co-robber a year later, in revenge for the betrayal related to the prior crime.

"'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive . . . .  [T]he motive is the cause, and both the charged and uncharged acts are effects.  *Both crimes are explainable as the result of the same motive*.' [Citation.]" (*Spector*, *supra*, 194 Cal.App.4th at p. 1381.)  For example, a defendant batters a victim for financial gain.  Two months later, the defendant kidnaps a victim for financial gain.

Thus, to establish motive, the uncharged offense does not need to be factually similar to the charged crimes; however, the uncharged and charged offenses must share

---

[1] Motive is not an element of murder, but "motive is often probative of intent to kill." (*People v. Smith* (2005) 37 Cal.4th 733, 740-741.)  For example, circumstances may provide a motive for a defendant wanting to shoot the victim, which is probative of whether the defendant shot the victim with an intent to kill.  (*Id.* at p. 741.)

2

a nexus in regard to (1) the uncharged crime causing the motive for the charged offense, or (2) the uncharged crime having the same motive as the charged offense. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018; *Spector*, *supra*, 194 Cal.App.4th at p. 1381.)

### (2) *Drug Evidence*

The PCP evidence was relevant to motive because defendant said during his law enforcement interview consumption of PCP may have caused him to blackout and become violent. Therefore, the uncharged offense of PCP possession/consumption created a possible motive for the charged crime, in that PCP may have caused defendant to become violent, blackout, and attack the victim. Therefore, the evidence a container that smelled of PCP was found in Allen's apartment was relevant to proving motive in the charged offense, because a reasonable jury could infer defendant consumed the PCP, which then caused defendant to attack the victim.

Further, the evidence of possible PCP consumption was not overly prejudicial to defendant (Evid. Code, § 352), since (1) there was no indication of how old the bottle may have been; (2) the bottle was at an apartment rented by Allen—it was not defendant's apartment and he only stayed there four nights per week; and (3) Detective Plonski testified Allen said a friend, Jamal, had consumed PCP in the apartment "the night before" the killing. In other words, while an inference regarding PCP use could have been made by the jury, the evidence of possible PCP possession/consumption was not so strong as to inflame the jury against defendant, especially in light of the charges, i.e. murder of a child. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 [a relevant

3

factor for determining prejudice is whether the uncharged act is more inflammatory than the charged conduct].)

Defendant asserts the PCP evidence was not probative on the issue of motive because there was nothing indicating defendant was under the influence of PCP at the time of the killing. Contrary to defendant's position, defendant said he may have committed the crime due to PCP consumption. Therefore, there was evidence reflecting defendant may have been under the influence of PCP at the time of the killing.

### (3) *Firearm and Gang Evidence*

A killing can be motivated by anger. (*People v. Arcega* (1982) 32 Cal.3d 504, 519 [defendant motivated to kill because he felt anger and frustration by what he perceived as victim's unfair treatment of him].) As stated in *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102, "the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] . . . may be sufficient [citation]."

Allen testified that, during a prior incident, she questioned defendant regarding injuries the victim suffered. Defendant told Allen the victim had a bruise on his head and a split lip due to falling and hitting his head on the sink. When Allen questioned defendant, defendant reacted by "pull[ing] a gun on [her]." During defendant's interview with law enforcement, defendant admitted he "chased" Father and brandished a firearm, after Father approached defendant holding a baseball bat. Specifically, defendant said he "chased [Father] down."

4

The firearm evidence reflects defendant can react with potentially lethal force when angry. Defendant brandished a firearm when questioned by Allen, seemingly an overreaction to being questioned. Similarly, defendant did not brandish a firearm in self-defense against Father's baseball bat—defendant chased after Father with the firearm. Again, defendant overreacted with potentially lethal consequences.

Allen testified when she left the house to go shopping, defendant was sleeping. Allen said defendant can be violent when awakened. Defendant said when Allen's baby cried, the crying irritated him. Defendant said after Allen went to the store, the baby cried and woke defendant. After picking up the baby and giving her a bottle, defendant laid back down to sleep. Approximately four minutes later, defendant heard the victim breathing heavily, and again had to get out of bed. Defendant said he picked up the victim. Defendant thought the victim may have been "play[ing]." Defendant said he was angry when the victim woke him. The jury could find defendant was angered by twice being woken by Allen's children, and was particularly angry the second time when he thought the victim was faking his breathing problems. Due to defendant's anger, he slammed the victim against a wall.

Thus, the firearm evidence was relevant on the issue of motive, because it reflected the uncharged crimes and the charged crimes shared the same motivation—defendant's potentially lethal bouts of anger. Since anger can be a motive for murder, as discussed *ante*, we conclude the trial court acted within the bounds of reason by permitting the firearm evidence to be presented to the jury.

We now turn to the gang evidence.  Allen testified she became fearful of defendant after moving into the apartment because defendant "had friends that [were] bad and [were] in gangs," which caused Allen to be scared.  Allen said defendant admitted to her he was a member of a gang known as "99 Mafia."

The further evidence that defendant had a tattoo consistent with members of the 99th Street Mafia and the 99th Street Mafia is a criminal street gang, helped corroborate Allen's testimony.  It explained to the jury why defendant may have been angrier or more violent than usual—because he was associating with gang members that Allen found scary.  Thus, the gang evidence was relevant to the issue of motive because it helped to explain why defendant was lashing out with potentially lethal force toward Allen, Father, and the victim.  It established the source of the violent behavior that would flare when defendant was confronted with situations that irritated him.  Accordingly, we conclude the trial court did not abuse its discretion by allowing the gang evidence to be presented to the jury.

Defendant asserts the gang evidence was overly inflammatory.  Contrary to defendant's position, the gang evidence was minimally inflammatory; the jury was given only enough information to corroborate the idea defendant may have been associated with a criminal street gang.  The jury was not informed of specific crimes committed by specific gang members, such as a robbery by John Doe on May 3.  Instead, the gang expert gave a list of crimes with which the gang may have been

6

involved.  There was nothing particularly inflammatory about the evidence; it only established minimal corroboration for Allen's statements about why she was scared of defendant.

### d)     Conclusion

As the trial court explained when giving its ruling, the uncharged offense evidence was relevant for purposes of "context."  The uncharged offenses helped the jury to understand defendant's anger had risen to nearly lethal levels in the past, and that it was possible the same had occurred during the killing of the victim, or that defendant's PCP use had caused him to violently attack the victim.  In sum, the trial court acted within the bounds of reason by allowing the firearm, drug, and gang evidence to be presented to the jury.  Further, since I have found no evidentiary error, I conclude the trial court did not violate defendant's rights to due process and a fair trial. (*People v. Partida* (2005) 37 Cal.4th 428, 436 ["the admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair"].)

### e)     Harmless Error

My colleagues have concluded the trial court erred by admitting the gang, drug, and firearm evidence, but that the errors are harmless.  As explained *ante*, I conclude the trial court did not err.  However, to the extent one determines the rulings were error, I disagree that such errors could be held harmless.

My colleagues have applied the *Watson* standard, so I will as well.  Under *Watson*, the question is whether it is reasonably probable the defendant would have

7

obtained a more favorable result absent the errors. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

In defendant's first trial in this case, the jury deadlocked, and the trial court granted defendant's motion for a mistrial. During motions in limine in the second trial, the prosecutor explained that, during the first trial, the evidence of defendant's gang membership "c[a]me in from [defendant's] own statements to the detectives." Defense counsel told the trial court, that, after the first trial, the prosecutor and defendant's mother, who is a paralegal, were interviewing the jury, and a juror said "the gang evidence that came out was highly prejudicial and was something that was—weighed heavily on their minds." Additionally, our Supreme Court has condemned the introduction of gang evidence that is only tangentially relevant, because gang evidence is "highly inflammatory." (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Because our Supreme Court has determined tangentially relevant gang evidence is highly inflammatory, and the first jury in this case deadlocked, any harmless error analysis related to the gang and firearm evidence should result in the conclusion that defendant would have obtained a more favorable result absent the errors. For example, if one is concluding the gang and firearm evidence was more prejudicial than probative and should not have been admitted, then it is reasonably probable that if the allegedly erroneously admitted evidence had been excluded, then the jury would have at least deadlocked again, i.e., a result more favorable to defendant.

8

Of course, it is possible the prosecution's medical evidence in the second trial was stronger than the medical evidence it presented in the first trial (this court does not have the transcript for the first trial); however, when the deadlocked jury in the first trial is combined with the conclusion that the gang and firearm evidence was prejudicial and should have been excluded, it is difficult to come to any other conclusion than there exists a reasonable possibility defendant would have had a more favorable result absent the errors. Accordingly, to the extent one could determine there was error in admitting the gang and firearm evidence, such errors could not be deemed harmless.

MILLER

J.

9